[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-15360

_____

Agency No. SE-2012-306-308

MIKE SUMPTER,
REX HARTZELL,
Employed by, Oak Grove Resources, LLC,

Petitioners,

versus

SECRETARY OF LABOR,
FEDERAL MINE SAFETY AND
HEALTH REVIEW COMMISSION,

Respondents.

_____

Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission

_____

(August 15, 2014)

Before MARTIN, Circuit Judge, and RESTANI,[*] Judge, and HINKLE,[**] District Judge.

MARTIN, Circuit Judge:

In this appeal, we must decide whether the word "corporation" includes limited liability companies (LLCs) for purposes of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq. (the Mine Act). The Mine Act was enacted "to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines in order to prevent death and serious physical harm." 30 U.S.C. § 801(c). To encourage compliance with the Act, § 110(c) provides that "[w]henever a corporate operator violates a mandatory health or safety standard . . . , any . . . agent of such corporation who knowingly authorized, ordered, or carried out such violation . . . shall be subject to the same civil penalties." Mine Act § 110(c), codified at 30 U.S.C. § 820(c) (emphasis added).

Petitioners Mike Sumpter and Rex Hartzell argue that the plain language reference to agents of corporations in § 110(c) does not include agents of an LLC, like themselves. Even if it does, Petitioners claim the administrative law judge's (ALJ) finding holding them personally liable was not supported by substantial

---

[*] Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by designation.

[**] Honorable Robert L. Hinkle, United States District Judge for the Northern District of Florida, sitting by designation.

evidence. Lastly, they argue that the violation underlying their civil penalties is improperly duplicative of an earlier violation for which the mine was also cited. After careful review, and with the benefit of oral argument, we affirm.

I.

Oak Grove Resources, LLC is a limited liability company registered in Delaware that operates an underground coal mine in Jefferson County, Alabama. During the time relevant to this appeal, Mr. Sumpter was the acting superintendent at the mine and Mr. Hartzell was the general mine foreman. This dispute stems from several violations issued by the Department of Labor's Mine Safety and Health Administration (MSHA) against Oak Grove in December 2009 and January 2010. To fulfill the purpose of the Mine Act, Congress authorized the Secretary of Labor "to develop and promulgate improved mandatory health or safety standards." 30 U.S.C. § 801(g). Because of the dangers of fires and explosions, detailed regulations require mines to develop a ventilation system, and methane and dust control plans that must be approved by the Secretary. Id. § 863(a), (o); see also 30 C.F.R. § 75.300 et seq. (ventilation standards for underground coal mines). Inspectors from the MSHA, acting on behalf of the Secretary, regularly visit mines to assure compliance with these and other regulations. 30 U.S.C. § 813(a).

In December 2009, several water pumps that Oak Grove used to prevent water accumulation in its ventilation system were not working properly. As a result, high water levels prevented Oak Grove from keeping up with the requirement that a certified person walk through the ventilation system every seven days and take measurements at specific locations to ensure the system was working properly. 30 C.F.R. § 75.364(a)(2)(iii). During an inspection on December 30, MSHA inspector Derrick Busby issued Citation No. 6698645 (the Citation) alleging a violation of that requirement. 30 C.F.R. § 75.364(a)(2)(iii).

When Inspector Busby issued the December 30 Citation, Oak Grove was not mining coal from the affected area of the mine. But Oak Grove began those operations again on January 4, 2010, apparently without notifying the MSHA and before remedying the problem identified in the December 30 Citation. Another MSHA Inspector, Edward Boylen, attempted to walk through the ventilation system on January 5 and 6, but he was also unable to reach the measurement locations specified in the ventilation plan because of water accumulation. He noted the mine books showed measurements had not been taken at eleven different locations for three weeks, instead of the required seven-day interval. Mr. Hartzell and possibly Mr. Sumpter had signed these examination books. When Inspector Boylen met with the mine supervisors, including Mr. Sumpter and Mr. Hartzell, Mr. Sumpter told him they knew they had not checked those eleven locations

4

because they were blocked by water.  Inspector Boylen also noticed the pressure differential at the exhaust fan in this part of the mine had increased significantly, which meant a decreased quantity of air passing through the fan and a restriction in air flow.  Based on his observations, Inspector Boylen issued Order No. 669830 on January 6, 2010.[1]  This Order required Oak Grove to remove workers and stop producing coal from this area of the mine.

After a hearing, an ALJ affirmed the January 6 Order against Oak Grove, as did the Federal Mine Safety and Health Review Commission (the Commission) on appeal.  Several months later, the MSHA filed petitions under § 110(c) of the Mine Act, 30 U.S.C. § 820(c), to assess civil penalties against Mr. Sumpter and Mr. Hartzell individually based on the January 6 Order.  An ALJ affirmed these petitions and the Commission declined Mr. Sumpter's and Mr. Hartzell's request for discretionary review.  Mr. Sumpter and Mr. Hartzell then filed this appeal pursuant to 30 U.S.C. § 816(a)(1).

---

[1] The Mine Act has a graduated scheme of enforcement that increases depending on the operator's compliance history and the gravity of the violation.  Generally, an operator who has violated a mandatory health or safety standard first receives a "citation," describing the violation and fixing a reasonable time for the violation to be addressed.  30 U.S.C. § 814(a).  Oak Grove's December 30 Citation, for example, identified the violation—failing to walk through the ventilation system every seven days—and set the abatement deadline for the next day.  When an operator fails to remedy a violation by the deadline, a MSHA inspector may then, depending on the severity of the violation, issue an "order" requiring the mine operator to withdraw workers from the mine or affected area of the mine until the violation is abated.  Id. § 814(b).  The January 6 Order against Oak Grove was this type of follow up order.

II.

A.  Statutory Interpretation of Section 110(c)

Section 110(c) of the Mine Act provides that:

Whenever a <u>corporate</u> operator violates a mandatory health or safety standard . . . , any director, officer, or agent of such <u>corporation</u> who knowingly authorized, ordered, or carried out such violation . . . shall be subject to the same civil penalties, fines, and imprisonment that may be imposed upon a person under subsections (a) and (d).

30 U.S.C. § 820(c) (emphasis added).  Mr. Sumpter's and Mr. Hartzell's principal argument is that the statute's use of the word "corporation" is unambiguous, and that the plain language of § 110(c) demonstrates that it only applies to agents of a corporation, not agents of an LLC, like themselves.  In response, the Secretary argues the undefined terms "corporation" and "corporate operator" in § 110(c) are ambiguous and that the Secretary's interpretation—that an LLC is a corporation for purposes of the Mine Act—is reasonable.  To resolve this dispute, we must consider whether the terms are ambiguous, and if so, the level of deference properly given to the Secretary's interpretation.

1. Is the Statute Ambiguous?

This Court reviews <u>de novo</u> the Commission's decision on a question of statutory interpretation.  See <u>U.S. Steel Mining Co. v. Dir., OWCP</u>, 719 F.3d 1275, 1280 (11th Cir. 2013).  When reviewing an agency's construction of a statute that it administers, we first determine whether Congress has directly spoken to the

6

question.  Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842, 104 S. Ct. 2778, 2781 (1984).  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Id. at 842–43, 104 S. Ct. at 2781.

We agree with the Commission's conclusion in Secretary of Labor v. Simola that the term corporation in § 110(c) is ambiguous.  34 FMSHRC 539, 545 (2012).  Notably, neither "corporate operator" nor "corporation" is defined by the Mine Act.  When a term has no statutory or administrative definition, we look to its ordinary or natural meaning.  Schwarz v. City of Treasure Island, 544 F.3d 1201, 1214 (11th Cir. 2008).  We also interpret the words of a statute by "taking their ordinary, contemporary, common meaning" at the time Congress enacted the statute.  See Perrin v. United States, 444 U.S. 37, 42, 100 S. Ct. 311, 314 (1979).

The dictionary definitions of "corporation" around the time of the passage of the Mine Act vary, but none limited its usage to an incorporated entity.  Instead, the definitions focus on attributes of a corporation.  See, e.g., Webster's New International Dictionary 596 (2d ed. 1957)[2] ("Any group of persons or objects treated by the law as an individual or unity having rights or liabilities, or both, distinct from those of the people or objects composing it."); Black's Law Dictionary 307 (5th ed. 1979) ("An artificial person or legal entity created by or

_____

[2] The definition of corporation in the next edition from 1993 is substantially similar.  Webster's Third New International Dictionary 510 (1993).

7

under the authority of the laws of a state or nation . . . .").  These features—having rights and liabilities distinct from the persons who compose it, and being an artificial or legal entity—are not exclusive to a company with the phrase "Inc." after its name, but also describe an LLC.  Black's Law Dictionary 275 (7th ed. 1999) (defining an LLC as "[a] company—statutorily authorized in certain states— that is characterized by limited liability. . .").  The lack of a specific definition of corporation in the Mine Act and the fact that the common usage of the word also includes some of the defining attributes of an LLC supports the conclusion that the term "corporation" is ambiguous as used in the Mine Act.

The legislative history of the Mine Act, and its predecessor the Coal Act, also suggest the term "corporation" is ambiguous.  Specifically, the congressional reports show a clear intent to "penetrat[e] the corporate shield," H.R. Rep. No. 91-563, at 12 (1969), and "to induce those officials responsible for the operation of a mine to comply with the Act and its standards," S. Rep. No. 95-181, at 41 (1977).[3] Interpreting "corporate operator" and "corporation" to only cover one type of

---

[3] The legislative history of the original Coal Act used terms like "corporate structure" and "corporate entities," also suggesting Congress intended the term in a general rather than a technical sense.  See, e.g., S. Rep. No. 91–411, at 39 ("Since the basic business judgments which dictate the method of operation of a coal mine are made directly or indirectly by persons at various levels of corporate structure, the committee believed it necessary to place the responsibility for compliance with the act and the regulations, as well as the liability for violations on those who control or supervise the operation of coal mines as well as on those who operate them."); id. ("Fines up to $50,000 are also prescribed for the corporate entity.").

8

commercial entity that shields individuals from liability would frustrate Congress's intent to pierce corporate forms that provide this liability shield.[4]

The fact that LLCs and other contemporary business forms authorized by state law were not in common use when the Mine Act was passed also creates ambiguity. The term LLC does not appear in Black's Law Dictionary until the Seventh Edition in 1999. Black's Law Dictionary 275, 343 (7th ed. 1999). If LLCs were not common when § 110(c) was enacted, we cannot read any intent into the fact that Congress did not address that corporate form.[5] This lack of clarity about how Congress intended LLCs to fit into the Mine Act is an ambiguity that the Secretary, as the head of the agency charged with enforcing the statute, is permitted to fill with a reasonable interpretation. See NBD Bank, N.A. v. Bennett, 67 F.3d 629, 633 (7th Cir. 1995) ("Many a statute resolves a portion of a problem, leaving other issues to the future—perhaps because the questions did not occur to anyone at the time . . . . That is one reason why Congress frequently delegates power to executive officials . . . ."); see also Taylor v. Roberts, 94 So. 874, 876

---

[4] Petitioners point to a proposed amendment that would have eliminated the word corporate and corporation, and replaced them with the word "operator." However, the fact that this amendment did not pass does not clear up the ambiguity about the scope of the word "corporation."

[5] Petitioners argue that this Court should give weight to the fact that Congress has amended the Mine Act twice since its enactment and chosen not to amend § 110(c). We reject this argument because it would be inappropriate to read any significance into Congress's actions where neither amendment specifically addressed the scope of § 110(c). See Brown v. Gardner, 513 U.S. 115, 121, 115 S. Ct. 552, 556–57 (1994) (finding re-enactment of a statute "to be without significance" to a dispute over statutory interpretation where the congressional proceedings made no reference to the issue and "there is no other evidence to suggest that Congress was even aware of the [agency's] interpretive position" (quotation marks omitted)).

(Fla. 1922) (extending application of a parking ordinance to automobiles even though it only listed "hackney carriages, carts, omnibuses, wagons, and drays" because the ordinance evidenced an intent to regulate all the then-known classes of vehicles using the streets).

In support of their argument that we should read the word "corporation" narrowly, Petitioners rely on Secretary of Labor v. Guess. 15 FMSHRC 2440 (1993), aff'd mem. sub nom. Sec'y of Labor v. Shirel, 52 F.3d 1123 (D.C. Cir. 1995). In Guess the Commission found that § 110(c) did not apply to partnerships. Id. at 2442–43. While we recognize the similarities between Guess and this case, the differences are far more important. The conclusion in Guess cannot be divorced from the fact that it was considering a partnership, an entity that was common at the time the Mine Act was passed, as shown by its specific mention in the statute. 30 U.S.C. § 802(f) (defining "person" as "any individual, partnership, association, corporation, firm, subsidiary of a corporation, or other organization").[6]

---

[6] Petitioners argue that this definition shows Congress contemplated a variety of business forms under the Mine Act but in § 110(c) chose only to include one of them, a corporation. However, neither this definition, nor any other part of the Act, shows that Congress considered LLCs or other business forms that, similar to corporations, had as a defining feature that they provided a liability shield. In contrast to an LLC, none of the general, overlapping terms listed in the Act's definition of "person," aside from corporation, necessarily have this defining feature. Black's Law Dictionary 111 (5th ed. 1979) (defining "association" as "a term of vague meaning used to indicate a collection or organization of persons who have joined together for a certain or common object"); id. at 571 (defining a "firm" as a "[b]usiness entity or enterprise," an "[u]nincorporated business," or a "[p]artnership of two or more persons"); id. at 991 ("Organization includes a corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership or association, two or more persons having a joint or common interest, or any other legal or commercial entity."). To the extent these terms can be

Partnerships, especially as understood at the time, also did not provide the same limitation on liability that motivated Congress to pass § 110(c).  Black's Law Dictionary 1009 (5th ed. 1979) (defining "partnership" as "[a] voluntary contract between two or more competent persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business, with the understanding that there shall be a proportional sharing of the profits and losses between them").

2.  What Level of Deference Applies?

Having concluded that the terms "corporation" and "corporate operator" in the Mine Act are ambiguous, we now consider what level of deference to extend to the Secretary's interpretation.  If a statute is silent or ambiguous with respect to the specific issue, the question is whether the agency charged with administering the statute has offered a reasonable interpretation.  Chevron, 467 U.S. at 843–44, 104 S. Ct. at 2782; Sec'y of Labor ex rel. Wamsley v. Mutual Mining, 80 F.3d 110, 115 (4th Cir. 1996).  An agency interpretation made outside of a formal regulation may still warrant Chevron deference in some instances, including where the agency issued its interpretation through notice-and-comment rulemaking.  See Miccosukee Tribe of Indians v. United States, 566 F.3d 1257, 1273 (11th Cir. 2009) (finding

defined to include both entities that are similar to and distinguishable from corporations—and even to include corporations themselves—the Act's definition of "person" simply provides further support for our conclusion that the meaning of "corporation" in § 110(c) is unclear.

agency handbook entitled to Chevron deference where agency was authorized to issue regulations and handbook was issued through notice-and-comment process).

In 2006, the Secretary of Labor issued an interpretive bulletin, providing that "agents of LLCs may be held personally liable under Section 110(c) of the Mine Act." 71 Fed. Reg. 38,902, 38,903 (July 10, 2006). Although the Secretary believed the bulletin was an "interpretive rule" that was not required to go through notice-and-comment rulemaking, the Secretary, in an exercise of discretion, solicited and responded to comments. Id. Because the Department of Labor is an agency authorized to issue regulations to implement the Mine Act, 30 U.S.C. § 801(g), and because the Secretary issued the interpretive bulletin through a discretionary notice-and-comment process, the interpretation is owed Chevron deference. See Miccosukee Tribe of Indians, 566 F.3d at 1273.

We also conclude that the Secretary's interpretation is reasonable. Perhaps most importantly, construing § 110(c) to include agents of LLCs is consistent with the legislative history we have discussed. Because LLCs provide a corporate shield similar to incorporated entities, it is reasonable to extend § 110(c) to cover agents of LLCs as well. Cf. Meyer v. Okla. Alcoholic Beverage Laws Enforcement Comm'n, 890 P.2d 1361, 1362–64 (Okla. Ct. App. 1995) (extending to LLCs a constitutional provision prohibiting corporations from holding a liquor license because an LLC "has as its most important feature the limitation of

12

liability[,]. . . a shield from the very responsibility and accountability that the constitutional provisions. . . sought to impose"). The Secretary's interpretation furthers Congress's intent to pierce the corporate form and reach officers or agents who would not otherwise be liable. It also prevents the subversion of Congress's intent through the creation of new hybrid business entities with different names that provide a similar limitation on liability. Cf. United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1091 (1st Cir. 1992) ("[I]n federal question cases, courts are wary of allowing the corporate form to stymie legislative policies.").

We therefore conclude that the undefined terms "corporation" and "corporate operator" in the Mine Act are ambiguous and the Secretary has offered a reasonable interpretation that is entitled to Chevron deference. Based on that conclusion, we further hold that an LLC is a corporation for purposes of the Act and that § 110(c) can be used to assess civil penalties against agents of an LLC.

B. Whether the ALJ's Decision was Supported by Substantial Evidence

We next consider Mr. Sumpter's and Mr. Hartzell's challenge to whether substantial evidence supports the ALJ's decision finding them personally liable for Oak Grove's January 6 Order. That Order involved Oak Grove's violation of 30 C.F.R. § 75.334(d), which requires a mine operator to seal a work area if it cannot be determined whether a ventilation system is working effectively.

13

The ALJ's conclusion, finding Petitioners personally liable for Oak Grove's violation, is a question of fact that is reviewed under the substantial evidence test. 30 U.S.C. § 816(a)(1) ("The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive."). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quotation marks omitted).

Under § 110(c), an agent can be found personally liable if he "knowingly authorized, ordered, or carried out" a violation of a mandatory health or safety standard.  30 U.S.C. § 820(c).  "Knowingly" means the individual knew or had reason to know of the violation. See Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n, 108 F.3d 358, 363–64 (D.C. Cir. 1997). Section 110(c) requires aggravated conduct that is more than ordinary negligence. Id. at 364.

Substantial evidence supports the ALJ's finding that the Petitioners knew that the ventilation system had not been evaluated as required and that its effectiveness could not be determined.  Inspector Boylen testified that given the mine's significant efforts to address the water problem, management plainly knew or should have known that the required weekly examinations were not being performed.  Mr. Sumpter and Mr. Hartzell also acknowledged at the hearing that

14

they knew that the effectiveness of the ventilation system could not be evaluated as required by § 74.334(d) and the approved ventilation plan, because the examiners could not travel to the ventilation plan's designated measurement locations. One or both of them also signed the mine books, which showed the required measurements had not been taken for three weeks.

In reaching his conclusion the ALJ also considered the context of Petitioners' actions. The Oak Grove mine tended to produce large amounts of methane, in that it liberated in excess of one million cubic feet of methane in a 24-hour period. [7] Because of the safety risk presented by high methane levels, on top the other rigorous safety standards and internal inspection requirements, Oak Grove was also subject to spot inspections by MSHA every five days. 30 U.S.C. § 813(i). Given this characteristic of the mine, the ALJ also found significant Petitioners' decision to re-start coal production despite the knowing violation of a "fundamental" standard and without seeking approval for their unproven and unapproved alternative method of determining the ventilation system's effectiveness. These facts offer substantial evidence to support the ALJ's conclusion that there was a threat of serious injuries to the entire mining crew which arose from aggravated conduct that was more than mere negligence.

---

[7] The mine had five methane ignitions during 2009, including two in December just before the mandatory safety violations at issue in this case.

15

To contest these findings, Petitioners rely mainly upon evidence that they believed the ventilation system was operating effectively and safely despite their knowledge that the mine was not in compliance with a mandatory safety requirement. This defense is not viable, because were we to adopt it, it would allow people, based on their personal opinions, to circumvent the rigorous and detailed health and safety standards Congress mandated to protect miners and regulate their dangerous working conditions. See 30 U.S.C. § 801(g); 30 C.F.R. §§ 75.1–75.1916 (subparts A–T of mandatory safety standards for underground coal mines). Regardless, the ALJ, who was able to observe the witnesses, offered a reasoned explanation for discounting Petitioners' purported beliefs and we will not reweigh his credibility determinations. See Bradberry v. Dir., OWCP, 117 F.3d 1361, 1367 (11th Cir. 1997) ("The ALJ is responsible for making credibility determinations and for weighing conflicting evidence . . . in a reasoned manner").

Because substantial evidence supports the ALJ's decision to hold Petitioners personally liable for the January 6 Order, we affirm on this issue.

## C.    Duplication

The Petitioners' final argument is that the Order underlying their civil penalties is impermissibly duplicative of the MSHA's earlier December 30 Citation against Oak Grove. This Court reviews de novo conclusions of law. See Stone & Webster Constr., Inc. v. U.S. Dep't of Labor, 684 F.3d 1127, 1132 (11th

16

Cir. 2012). Citations and orders are not duplicative as long as the standards impose separate and distinct duties. Sec'y of Labor v. Spartan Mining Co., 30 FMSHRC 699, 716 (2008).[8]

We reject the Petitioners' argument because the duties imposed by the regulations underlying the December 30 Citation and the January 6 Order were distinct. The December 30 Citation was issued for a violation of 30 C.F.R. § 75.364(a)(2)(iii), which required Oak Grove to walk through the ventilation system every seven days to take measurements and determine its effectiveness. Meanwhile, the January 6 Order was based on § 75.334(d), which required Oak Grove to seal the work area if it could not determine that the ventilation system was working effectively. Because the two standards impose separate and distinct duties—in a nutshell, monitoring versus sealing—the fact that Oak Grove's violations may have come about because of the same event is not dispositive. Sec'y of Labor v. Cyprus Tonopah Mining Corp., 15 FMSHRC 367, 378–79 (1993) ("[A]lthough the [operator's] violations may have emanated from the same events, the citations are not duplicative because the two standards impose separate and distinct duties upon an operator.").

---

[8] Petitioners also urge us to consider whether the required abatement efforts were duplicative. However, the split decision in Spartan Mining demonstrates that the Commission has not definitively adopted this principle. 30 FMSHRC at 728–730 (dissent by two of the four commissioners). Regardless, Oak Grove could have abated the Citation and Order in a variety of ways, as the ALJ noted here, some of which were not duplicative.

### III.

In sum, the terms "corporation" and "corporate operator" as used in § 110(c) of the Mine Act are ambiguous and the Secretary's interpretative bulletin provides a reasonable interpretation of those terms to which we owe <u>Chevron</u> deference. We therefore hold that § 110(c) permits assessment of civil penalties against agents of an LLC.  Based on that conclusion, and because the ALJ's decision was supported by substantial evidence and the underlying Citation and Order were not duplicative, the ALJ's decision is **AFFIRMED.**