**UNITED STATES of America EX REL. Gerry PHALP and Matt Peoples, Plaintiffs,**

v.

**LINCARE HOLDINGS, INC. and Lincare, Inc. d/b/a Diabetic Experts of America, Defendants.**

**CASE NO. 10–cv–21094–KMW**

United States District Court, S.D. Florida.

Signed July 10, 2015

Entered 07/13/2015

S. Hooker, Phelps Dunbar, LLP, Tampa, FL, for Defendant.

## ORDER

KATHLEEN M. WILLIAMS,
UNITED STATES DISTRICT JUDGE

**THIS MATTER** came before the Court on Defendants Lincare Holdings, Inc. and Lincare, Inc. d/b/a Diabetic Experts of America's motion for summary judgment (Lincare, Inc. is referred to as "Lincare;"[1] Lincare Holdings, Inc. is referred to as "Holdings"), on Relators Matt Peoples and Gerry Phalp's six threshold exemplars. (DE 74). The Court granted Relators' Federal Rule of Civil Procedure 56(d) motion for additional discovery and allowed supplemental briefing.[2] (DE 118). Accordingly, the motion is fully briefed. (DE 75, 100, 101, 105, 194, 195, 196, 199, 206, 207, 209).[3] Defendants' motion to strike expert report from the Relators' summary judgment briefing on the exemplars is also before the Court and ripe for disposition. (DE 104, 117, 123).

### (I) BACKGROUND

The dispute in this case involves how Diabetic Experts marketed its diabetic testing supplies to six Medicare beneficiaries and then billed Medicare for the supplies that it provided. (Second Amended Complaint ("SAC") DE 43). Relators did not plead facts indicating that Diabetic Experts failed to send the billed-for

Susan Torres, U.S. Attorney's Office, Miami, FL, Daniel E. Gustafson, Gustafson Gluek PLLC, Minneapolis, MN, Charles J. Kocher, Patrick Howard, Simon Bahne Paris, Saltz Mongeluzzi Barrett & Bendesky, PC, Philadelphia, PA, Curtis Bradley Miner, Stephanie Anne Casey, Colson Hicks Eidson, Coral Gables, FL, Daniel Allen, Jose M. Bautista, Bautista & Allen, Kansas City, MO, for Plaintiff.

Lawrence Phillip Ingram, Andrew Brian Albritton, Jessica Kirkwood Alley, Michael

---

1. Throughout this opinion, the Court refers to Lincare and Diabetic Experts separately in order to address arguments made by Relators that are premised on the distinction between them.

2. In addition to supplementing three of their existing responses to Defendants' statement of material facts, which was contemplated by the Court in granting Relators' 56(d) motion, Relators also provided the Court with 49 "Additional Undisputed Material Facts." (DE

199 Additional Facts ¶¶ 1–49). Accordingly, the Court distinguishes between citations to the responsive paragraphs and the additional facts.

3. The Court has allowed the Parties in this case to submit multiple motions for summary judgment. (*See, e.g.,* DE 217). The Court will not consider the briefing on those motions in deciding the fully briefed motion as to the six exemplars.

items—blood-testing strips, lancets, disposable lancet devices, and testing solution—to the Medicare beneficiaries or that the items provided were of inferior quality or overpriced. Rather, in Count I, Relators argue that Diabetic Experts violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), by presenting false claims to Medicare for sales that arose out of allegedly illegal and unsolicited telephone calls and that relied on purportedly false assignments of benefits ("AOBs") given to Lincare. In Count II, Relators argue that Holdings and Diabetic Experts violated 31 U.S.C. § 3729(a)(1)(B)[4] by making or using improper sales leads generated from Holdings' database of patient information and by using the purportedly false AOBs given to Lincare.

For the reasons discussed below, the Court grants Defendants' motion for summary judgment on the six exemplars. The Court concludes that Lincare and Diabetic Experts are a single supplier for the purposes of the Medicare statutes, regulations, and supplier standards at issue and that their reliance on AOBs for provision of diabetic supplies was not inconsistent with the Center for Medicare and Medicaid Services' ("CMS")[5] implementation of the Medicare statutes. Because Diabetic Experts is the same supplier as Lincare, Holdings did not violate the False Claims Act by sharing Lincare's patient information and documents with Diabetic Experts.

### (I)(A) Pertinent Medicare Statutes And Regulations

"The Medicare Program is a system of health insurance administered by the United States Department of Health and Human Services, through the Center for Medicare and Medicaid Services." See United States ex rel. Walker v. R & F Props. of Lake Cnty., Inc., 433 F.3d 1349, 1351 (11th Cir.2005). It is a "vast and complicated" program. United States ex rel. Wilkins v. United Health Group, Inc., 659 F.3d 295, 310–11 (3d Cir.2011). Part B, the part of the Medicare program at issue here, is "voluntary supplemental medical insurance covering ... durable medical equipment." Int'l Rehabilitative Sciences Inc. v. Sebelius, 688 F.3d 994, 997 (9th Cir.2012). To provide context, the Court highlights a number of pertinent provisions from the complex regime found in the United States Code, the Code of Federal Regulations, and the Federal Register.

### (l )(A)(1) Definition of DMEPOS: Supplies and Equipment

Medicare Part B pays for "covered items." 42 U.S.C. § 1395m(a)(13) ("[T]he term 'covered item' means durable medical

---

**4.** Congress amended the False Claims Act (the "Act" or "FCA") in May of 2009 with the Fraud Enforcement and Recovery Act ("FERA"), Pub.L. No. 111–21, 123 Stat. 1617 (2009). Relators properly cite the False Claims Act as amended because, as the Eleventh Circuit held in Hopper v. Solvay Pharm., Inc., 588 F.3d 1318 (11th Cir.2009), section 4(f)(1) of FERA provides that the amendments pertinent to the conduct at issue "shall take effect as if enacted on June 7, 2008, and apply to all claims ... that are pending on or after that date." Hopper, 588 F.3d at 1327 n. 3 (emphasis in original); Pub.L. No. 111–21, § 386; (SAC DE 43 ¶ 7). The claims at issue were submitted after June 7, 2008. While

there are substantive differences between the old and new versions of the False Claims Act, pre-FERA precedent remains binding on many issues arising in post-FERA false claims cases. See Urquilla–Diaz v. Kaplan Univ., 780 F.3d 1039, 1045 n. 6 (11th Cir.2015); United States ex rel. Mastej v. Health Mgmt. Assocs., Inc., 591 Fed.Appx. 693 n. 3 (11th Cir.2014).

**5.** Until 2001, CMS was known as the Health Care Financing Administration. See CMS; State of Organization, Functions and Delegations of Authority; Reorganization Order, 66 Fed.Reg. 35437–03 (July 5, 2001). For ease of reference, the Court refers only to CMS.

equipment."). Title 42 U.S.C. § 1395x describes durable medical equipment ("DME"[6]), which includes "blood-testing strips and blood glucose monitors." The only durable medical equipment, prosthetics, orthotics, and supplies ("DMEPOS")[7] at issue are: blood-testing strips, lancets, disposable lancet devices, and testing solution supplied to the exemplar beneficiaries. Diabetic Experts did not submit any claims to Medicare for blood glucose home testing monitors—they were provided free of charge. (*See* DE 75 ¶ 20; *see also* DE 101 ¶ 20 ("disput[ing] as written" Defendants' statement of facts, but not disputing the underlying facts)). The Parties cite to various statutes, regulations, and agency interpretations to support their respective theories of whether covered items such as testing strips or lancets are supplies or equipment. That classification—supplies vs. equipment—goes to the issue of whether the AOBs used by Diabetic Experts were consistent with regulations.

Under the subheading of "payment for durable medical equipment," 42 U.S.C. § 1395m provides that testing strips are included in diabetic supplies, which is a subset of durable medical equipment. 42 U.S.C. § 1395m(a)(1)(H)(i) ("[T]he payment amount under this part for diabetic supplies, including testing strips, ... shall be equal to the single payment amounts established ... under section 1395w–3 of this title."). As referenced, 42 U.S.C. § 1395w–3(a)(2)(A) describes "durable medical equipment and medical supplies" as "covered items (as defined in section 1395m(a)(13) of this title)," including "supplies used in conjunction with durable medical equipment." Thus, the terms supplies and equipment are both used when referring to items like blood-testing strips. While the statutes describe general cate-

gories of covered items, including durable medical equipment, the applicable regulations provide a more precise definition that is informed by the expertise of CMS.

Supplies are those items necessary for the effective use of *durable* equipment. 42 C.F.R. § 414.402(2). The Medicare regulations define durable medical equipment as "equipment furnished by a supplier [that] can withstand repeated use." 42 C.F.R. § 414.202(1). Thus, the applicable regulations support a distinction between equipment as reusable implements and supplies as materials that may be used to replenish or augment the equipment. This represents a qualitative judgment by CMS that distinguishes equipment, which can withstand repeated usage, from more ephemeral supplies. As a result, "[s]upplies necessary for the effective use of DME" are listed separately from durable medical equipment in the regulations. 42 C.F.R. § 414.402; *see also* 42 C.F.R. § 400.202 (definitions specific to Medicare: "Services means medical care or services and items, such as ... supplies, appliances, and equipment.").

### (I)(A)(2) *DMEPOS Supplier Rules*

Title 42 C.F.R. § 424.57 sets out the "special payment rules for items furnished by DMEPOS suppliers and issuance of DMEPOS supplier billing privileges." A DMEPOS supplier is "an entity or individual, which sells or rents Part B covered items to Medicare beneficiaries and which meets the standards in paragraphs (c) and (d) of this section." 42 C.F.R. § 424.57(a). In addition to meeting those standards, all DMEPOS suppliers must also comply with the general rules in paragraph (b) of the section in order to be eligible to participate in Medicare and receive payment for a covered item. *See* 42 C.F.R. § 424.57(b).

---

6. Medical equipment used in the home is sometimes referred to as Home Medical Equipment ("HME"). (*See, e.g.,* DE 75 ¶ 34).

7. 42 C.F.R. § 424.57(a) and (c).

This is an ongoing obligation; at the time of its application, the supplier promises that it will continue to meet the standards set forth in section (c) of the special payment rules. *See* 42 C.F.R. § 424.57(c).

#### (*l* )(A)(2)(a) *Supplier Identification*

The general rules found in section (b) of the DMEPOS supplier special payment rules require that the supplier meet certain conditions to be "eligible to receive payment for a Medicare-covered item." 42 C.F.R. § 424.57(b). One such condition is that a supplier is not eligible to be paid unless it obtains a supplier number. *See* 42 U.S.C. § 1395m(j)(1)(A). Accordingly, before submitting claims to Medicare, each DMEPOS-selling business location that meets the eligibility requirements receives a supplier number from the National Supplier Clearinghouse ("NSC").[8] CMS uses the term subpart to refer to the "separate physical locations" of health care providers. *See* HIPAA Administrative Simplification: Standard Unique Health Identifier for Health Care Providers, 69 Fed.Reg. 3434–01, 3438 (Jan. 23, 2004) (to be codified at 45 C.F.R. Part 162).

Furthermore, pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), suppliers are required to obtain National Provider Identifiers ("NPI")[9] from the National Plan and Provider Enumeration System ("NPPES").[10] *See* 45 C.F.R. § 162.408; 45 C.F.R. § 162.406; (DE 75 ¶ 13). DMEPOS suppliers like Lincare are known as organization health care providers, which may be eligible for multiple NPIs based on the number and nature of their subparts. (DE 75 ¶ 14; 75–3 at 83, 85, Centers for Medicare and Medicaid Services, Medicare Learning Network, The National Provider Identifier (NPI): What You Need to Know (2012); CMS Medicare Program Integrity Manual Ch. 15 § 15.3 DE 195–4). At the

---

8. The National Supplier Clearinghouse was the contractor responsible for the enrollment and re-enrollment process for DMEPOS suppliers. 42 C.F.R. § 424.57(a) (2009). The regulation was amended in 2014 to change the terminology to reflect the possibility that different Centers for Medicare Services contractors other than NSC may handle the enrollment of DMEPOS suppliers and ensure that those DMEPOS suppliers are meeting supplier standards. That 2014 amendment removed the term "National Supplier Clearinghouse (NSC)" from the definitions in § 424.57(a). *See* Medicare Program; Surety Bond Requirement for Suppliers of Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS); Technical Amendment, 79 Fed.Reg. 69772–01 at 69773 (Nov. 24, 2014) (to be codified at 42 C.F.R. Part 424). Likewise, the NSC numbers have been succeeded by Provider Transaction Access Number ("PTAN"). Nevertheless, for simplicity, the Court refers to the NSC and NSC numbers throughout this opinion.

9. The NPI is a 10-position numeric identifier that is the standard unique health identifier for health care providers. 45 C.F.R. § 162.406. The NPI system was meant to, and in large part has, replaced a variety of

other identifiers used by states or the federal government to identify service providers. Nevertheless, those identifiers in use prior to HIPAA's requirement that suppliers obtain an NPI often remain in use. Those pre-NPI identifiers are sometimes referred to as "legacy provider identifiers." *See* Centers For Medicare And Medicaid Services, FAQ 6115, https://questions.cms.gov/faq.php?id=5005 &faqId=6115 (last visited Mar. 11, 2015)., *see also* DE 75–3 at 83, Centers for Medicare and Medicaid Services, Medicare Learning Network, The National Provider Identifier (NPI): What You Need to Know (2012) ("The NPI must be used in place of legacy provider identifiers such as... National Supplier Clearinghouse (NSC)" numbers.); (*see also* CMS Medicare Program Integrity Manual Ch. 15 § 15.1.1 DE 195–4).

10. The NPPES was formerly known as the National Provider System ("NPS"). *See* http://www.cms.gov/Regulations-and-Guidance/HIPAA-Administrative Simplification/NationalProvIdentStand/downloads/npi_fs_geninfo_010906.pdf (last visited Mar. 11, 2015). For ease of reference, the Court refers only to NPPES.

provider's request, the NPPES may assign an NPI, which is always an identifier specific to a location, "to a subpart of a health care provider ... if the identifying data for the subpart are unique." 45 C.F.R. § 162.408(a)(1); § 162.408(g). Moreover, if that subpart "would be a covered health care provider if it were a separate legal entity," then the supplier "must" obtain an NPI. 45 C.F.R. § 162.410(a)(1).

The subpart enrollment requirement is echoed elsewhere in the DMEPOS supplier special payment rules, which provide that a supplier must enroll each "separate physical location it uses to furnish Medicare-covered DMEPOS" and that "CMS issues only one supplier number for each location." 42 C.F.R. § 424.57(b). Although all DMEPOS supplier subparts must comply with the "DMEPOS quality standards and be separately accredited," the regulations make provision for how "multisite supplier[s]" can satisfy those standards. *See id.* CMS has spoken clearly on the topic in a Special CMS Communication Regarding the NPI and Medicare DME Suppliers: "Medicare DME suppliers are required to obtain an NPI for every location." [11] This is not a new position; the special communication regarding NPI references a January 2006 paper ("Subpart Paper") entitled Medicare Expectations On Determination Of Subparts By Medicare Organization Health Care Providers Who Are Covered Entities Under HIPAA that contains the same interpretation.[12] Furthermore, the Subpart Paper is incorporated into the NPI section of the CMS Medicare Program Integrity Manual Chapter 15.

The Subpart Paper was explicit in both its purpose and guidance. CMS stated that "[t]his paper reflects the Medicare program's expectations on how its enrolled organization health care providers who are covered entities under HIPAA will determine subparts and obtain NPIs for themselves and any subparts." *See* Subpart Paper at 1. The Subpart Paper directed that "[e]ach enrolled supplier of DMEPOS that is a covered entity under HIPAA must designate each practice location (if it has more than one) as a subpart and ensure that each subpart obtains its own unique NPI." *Id.* at 8. The result is that a supplier must determine how to apply for NPIs, but "Medicare regulations require that each practice location of a supplier of DMEPOS (if it has more than one) must, by law, be separately enrolled in Medicare and have its own unique Medicare identification number." *Id.* Therefore, it is clear that a single supplier can have multiple subparts that have their own NPIs. *Id.*; *see also* Medicare Program; Additional Supplier Standards, 65 Fed.Reg. 60366–01, 60371 (Oct. 11, 2000) (to be codified at 42 C.F.R. Part 424) (noting that "some suppliers may have multiple sites from which they do business").

### (I)(A)(2)(b) *Prohibition On Unsolicited Telephone Contacts*

The standards require that the supplier operate its business and furnish covered items in compliance with "federal regulatory requirements that specify requirements for the provision of DMEPOS." 42 C.F.R. § 424.57(c). The supplier standard at issue in this case is 42 C.F.R. § 424.57(c)(11), which requires a supplier

---

**11.** *See* Centers for Medicare and Medicaid Services, Educational Resources, https://www.cms. gov/Regulations-and-Guidance/HIPAA-AdministrativeSimplification/National ProvIdentStand/Downloads/npi_dme_comm. pdf (last visited June 15, 2015).

**12.** *See* Centers for Medicare and Medicaid Services, Medicare NPI Implementation, https:// www.cms.gov/Regulations-and-Guidance/ HIPAA-AdministrativeSimplification/National ProvIdentStand/Downloads/Medsubparts 01252006.pdf (last visited June 15, 2015).

to "agree not to contact a beneficiary by telephone when supplying a Medicare-covered item" unless one of three exceptions applies. This prohibition on certain telephone marketing is also codified in 42 U.S.C. § 1395m(a)(17).

Under both the statute and the regulation, a supplier is prohibited from making unsolicited telephone contacts with customers who are enrolled in Medicare unless one of three exceptions applies:

(i) The individual has given written permission to the supplier to make contact by telephone regarding the furnishing of a covered item.

(ii) The supplier has furnished a covered item to the individual and the supplier is contacting the individual only regarding the furnishing of such covered item.

(iii) If the contact is regarding the furnishing of a covered item other than a covered item already furnished to the individual, the supplier has furnished at least 1 covered item to the individual during the 15–month period preceding the date on which the supplier makes such contact.

42 U.S.C. § 1395m(a)(17); 42 C.F.R. § 424.57(c)(11). Only the third exception is at issue here.

### (I)(A)(2)(c) *Assignment Of Benefits And Maintaining Signatures On File*

One of the other federal regulatory requirements identified in 42 C.F.R. § 424.57(c) that governs suppliers is that a claim submitted to Medicare on behalf of a customer must be authorized by that customer. This authorization can be made by the Medicare beneficiary customer's signature on the claim. *See* 42 C.F.R. § 424.36. In the alternative, there is a procedure

where "Medicare pays the supplier for covered services if the beneficiary ... assigns the claim to the supplier and the supplier accepts assignment." 42 C.F.R. § 424.55(a). Consequently, a beneficiary need not sign every single claim or individually assign each one. Rather, a supplier may maintain the customer's signature on file using a form "that contains adequate notice to the beneficiary ... that the purpose of the signature is to authorize a provider or supplier to submit a claim to Medicare for specified services furnished to the beneficiary." 42 C.F.R. § 424.36(a). The CMS Claims Manual does not require "that the services be itemized or that the information submitted be complete." (CMS Claims Processing Manual Ch. 1 § 50.1.7—Definition of Claim for Payment DE 206–2 at 2).

The authorization may be incorporated by reference into subsequent claims. *See* 42 C.F.R. § 424.40(a). Furthermore, the supplier can retain an authorization in the supplier's file, which "may be effective indefinitely." 42 C.F.R. § 424.40(d). The indefinite effectiveness provision is not unlimited, however, and "a new statement is required if another item of equipment is rented or purchased." 42 C.F.R. § 424.40(d)(2).

### (I)(B) *Relevant Facts Not In Material Dispute*

During the time period at issue,[13] Lincare supplied Medicare beneficiaries suffering from chronic obstructive pulmonary disease with oxygen, respiratory, and other therapy services. (DE 75 ¶¶ 5–7). Diabetic Experts supplied Medicare beneficiaries suffering from diabetes with diabetic-testing supplies. (*Id.* ¶ 21). Lincare was

---

**13.** Relators worked for Lincare from October 2008 until November 2009 (SAC DE 43 ¶¶ 9, 13, 16, and 20) and the exemplar violations took place between December 2008 and September 2009 (SAC DE 43 ¶¶ 128, 134). Relators allege that violations are ongoing, but that allegation is not relevant to the instant motion for summary judgment.

(and remains today) a DMEPOS supplier. (DE 75 ¶ 7; DE 199 Additional Facts ¶¶ 1, 21 (noting that Lincare is subject to the supplier standards)). Holdings acts as a holding company; Lincare is one of its wholly-owned subsidiaries. (DE 75 ¶¶ 1, 3; SAC DE 43 ¶ 78; DE 57 ¶ 78; DE 101 ¶ 12). Holdings supports Lincare's information systems, including a database called "ABA," which "contains telephone numbers for customers of Diabetic Experts." (DE 199 ¶ 4). Only Diabetic Experts, Lincare, and Holdings had access to the ABA; other entities in the Holdings corporate structure did not. (DE 197-2 at 15–16).

Relators begin from the premise that Diabetic Experts is a separate supplier from Lincare. (SAC DE 43 ¶ 2). Although the Parties vigorously dispute whether Lincare and Diabetic Experts are, as a matter of law, separate suppliers for the purposes of Medicare eligibility, marketing, billing, and the propriety of using general AOBs, the following facts are uncontroverted. (See, e.g., DE 101 ¶ 12; DE 199 ¶¶ 4, 8, Additional Facts ¶¶ 2–5, 11, 13, 15, 18, 21, 26, 29–31; DE 207 at 1–3). On March 18, 2004, Lincare registered the fictitious name Diabetic Experts of America to do business in Missouri. (DE 75 ¶ 10; Affidavit of Don Crisp, Director of Taxes, Lincare Holdings, Inc. DE 75–1 ¶ 15). There is no separate Diabetic Experts of America company, affiliate, or entity listed on Holdings' corporate organization chart for 2008 or 2009 (DE 100–11 at 2–3); Diabetic Experts is a fictitious name used by Lincare. (Crisp Aff. DE 75–1 ¶ 16; DE 75 ¶ 12; DE 101 ¶ 6 ("It is undisputed that 'Diabetic Experts of America' is a d/b/a of Lincare, Inc.")).

Lincare registered with the NSC as a DMEPOS supplier. (DE 75 ¶ 7). Lincare maintains subparts like Diabetic Experts throughout the United States. (Id. ¶¶ 9, 17; see also Affidavit of Stacey Murphy,

Division Reimbursement Manager, Lincare Holdings, Inc. DE 195–6 ¶ 9 (testifying that Lincare has over 800 subparts operating throughout the United States, each with its own unique NPI)). In accordance with the Medicare statutes and regulations, Lincare enrolled each of those subparts with the NSC. (DE 75 ¶ 9). In 2004, Lincare enrolled its Kansas City, Missouri brand, Diabetic Experts, with the NSC and obtained an NSC number for it. (Id. ¶ 10). Lincare's 2004 CMS–855S enrollment form for its Kansas City subpart reflected that: (a) Lincare was enrolling a "New Location for a Currently Enrolled DMEPOS Supplier"; (b) the legal name of that business was "Lincare Inc., d/b/a Diabetic Experts of America"; and (c) the Tax ID number used for the "Supplier IRS Identification" information was Lincare's: no. xx-xxx2900. (Id. ¶ 10). During one onsite inspection of Diabetic Experts, NSC completed the field for supplier name: "Lincare, Inc." (May 19, 2014 NSC onsite inspection of Diabetic Experts DE 100–5 at 2). In 2006, Lincare also obtained an NPI for Diabetic Experts. (DE 75 ¶ 15).

At each subsequent NSC inspection, Diabetic Experts certified that it had been provided with a copy of the supplier standards (listed in 42 C.F.R. § 424.57(c)) and acknowledged that its NSC number could be revoked if, at any time, it was determined that Diabetic Experts was noncompliant. (See May 19, 2014 NSC onsite inspection of Diabetic Experts DE 100–5 at 6; see also Mar. 22, 2012 NSC onsite inspection of Diabetic Experts DE 100–5 at 26). Diabetic Experts also agreed to "abide by the Medicare laws, regulations, and program instructions applicable to DMEPOS suppliers." (2004 CMS–855S enrollment form DE 75–2 at 34). Diabetic Experts further expressed its understanding that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instruc-

tions (including but not limited to, the federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare." *Id.*

During 2008 and 2009, Relators [14] placed sales calls to Medicare beneficiaries—the six exemplars identified in the SAC—who had previously received covered items from Lincare. (DE 75 ¶ 20; DE 199 Additional Facts ¶ 2). Using sales leads from Lincare's oxygen services business, Diabetic Experts made phone calls to each of the six exemplar Medicare beneficiaries.[15] (DE 75 ¶ 20; DE 199 Additional Facts ¶ 12). This was done for the purpose of offering them a free diabetic-testing monitor and to sell them diabetic-testing supplies. (DE 75 ¶ 20). These beneficiaries

had not previously obtained diabetic testing supplies from Diabetic Experts. (DE 199 Additional Facts ¶¶ 5, 13).

Diabetic Experts then made the sales to the beneficiaries and submitted claims to Medicare for diabetic-testing supplies, *e.g.*, testing strips and lancets used in testing blood glucose levels, which Medicare paid relying on the fact that the telephone contacts and AOBs were both compliant with applicable statutes and regulations. (DE 75 ¶ 20). Diabetic Experts used its NPI, which is different from Lincare's, to bill Medicare for the diabetic testing supplies on behalf of the six exemplar beneficiaries. (DE 199 Additional Facts ¶¶ 11, 15).

The sales history is represented in a table, below:

14. Relators did not actually make all six of the exemplar sales. As alleged in the SAC, Megan Wheat made the sale to billing account # 033–380–018–996, Gene Wilson made the sale to billing account # 033–380–026–686, and Ken Knisley made the sale to billing account # 033–380–027–354. (SAC DE 43 ¶¶ 131, 142, 146).

15. In the supplemental briefing, the Parties disagree about how the six exemplar benefi-

ciaries were identified as potential sales targets and what role Holdings played in managing the exemplars' billing and biographical data. But the Parties do agree that the exemplars were Lincare customers and that Diabetic Experts handled the exemplar transactions. (DE 199 ¶ 4; DE 207 ¶ 4).

| # | Billing Account | Date of Telephone Contact By Lincare Inc. d/b/a Diabetic Experts of America | Diabetic Testing Supplies Shipped as a Result of Telephone Contact | Date Lincare Inc. Previously Furnished a Medicare Covered Item |
|---|---|---|---|---|
| 1. | 033-380-013-114 | Dec. 8, 2008 | Testing strips, lancets, disposable lancet device, & solution | Aug. 21, 2008 |
| 2. | 033-380-018-996 | Mar. 2, 2009 | Testing strips, lancets, disposable lancet device, & solution | Feb. 8, 2009 |
| 3. | 033-380-025-671 | May 5, 2009 | Testing strips, lancets, disposable lancet device, & solution | Apr. 20, 2009 |
| 4. | 033-380-026-013 | May 7, 2009 | Testing strips, lancets, disposable lancet device, & solution | Mar. 5, 2009 |
| 5. | 033-380-026-688 | May 14, 2009 | Testing strips, lancets, disposable lancet device, & solution | Mar. 18, 2009 |
| 6. | 033-380-027-354 | May 20, 2009 | Testing strips, lancets, disposable lancet device, & solution | Apr. 17, 2009 |

(DE 75 ¶ 20).

There is no material dispute about three salient facts presented by the exemplars. (DE 101 ¶ 20 ("The content of the sales history with the six exemplars is undisputed.")). First, Diabetic Experts contacted the beneficiaries, sold the supplies, and billed Medicare. (DE 75 ¶ 20). Second, Diabetic Experts billed for testing strips, lancets, disposable lancet devices, and testing solution, but not for the diabetic-testing monitor.[16] (*Id.*). It is uncontroverted that the billed-for DMEPOS at issue here are not durable. The "lancet device" is necessarily "disposable." (*Id.*). And nobody suggests that the blood-testing strips can be reused. Third, Lincare provided a Medicare covered item to the exemplar Medicare beneficiaries in the 15–month period prior to the date of the telephone

contact. (DE 75 ¶¶ 20–21; DE 101 ¶ 21 (disputing the legal issue of whether the identity of the supplier is determined by reference to the federal tax identification number, but not the facts of the sales); DE 101 Additional Facts ¶ 10; DE 199 Additional Facts ¶ 13).

Before the sale of diabetic supplies to the six exemplar Medicare beneficiaries, each of the six beneficiaries executed a patient agreement and consent form that contained, among other things, an assignment of benefits in favor of Lincare and its affiliates. (DE 75 ¶ 33). In those consent forms, the six beneficiaries agreed: (i) to rent or purchase covered items from either "Lincare and its affiliates" or from "Supplier and its affiliates"; (ii) that Lincare would provide "HME and Supplies" or "DME;" (iii) to the release of their health

---

**16.** NSC's later onsite inspection corroborates Diabetic Experts' position that it does not bill for glucose monitors, but rather provides them to beneficiaries at no charge. (Mar. 22, 2012 NSC onsite inspection of Diabetic Experts DE 100–5 at 24–25).

information for treatment, payment and health care operations; and (iv) to an assignment of benefits wherein the patient requests that the "payment of benefits be made to" either Lincare or the Supplier. (*Id.* ¶ 34).[17]

The consent forms, which the Parties and the Court have referred to as the AOBs, provided that they were to be used in lieu of the beneficiaries' signatures on claims forms and Lincare kept them on file for this purpose. (DE 75 35–36). Diabetic Experts used the AOBs as signatures on file for the claims it submitted to obtain payment from Medicare for the diabetic testing supplies sold to the six exemplar Medicare beneficiaries. (DE 75 ¶ 37; DE 199 Additional Facts ¶¶ 16–18, 20, 31, 33–34). Although Diabetic Experts had its own form AOBs, it is undisputed that it "did not obtain AOBs that were specifically for diabetic testing supplies from Medicare beneficiaries—including the six exemplar beneficiaries—for its claims to Medicare for payment," but rather used the Lincare AOBs it had on file. (DE 199 Additional Facts ¶¶ 32–33, 36; DE 75 ¶ 34; DE 101 Additional Facts ¶ 19).

In October 2009, months after the submission of the claims for the six exemplar transactions, members of Holdings' compliance department discussed generally—that is, not directly concerning diabetic supplies—whether their AOBs may need to be "item specific." (DE 199 Additional Facts ¶¶ 40–43). Relators identify this discussion as evidence supporting the legal conclusion that Defendants "had actual knowl-edge of the requirement that AOBs must be item-specific." (DE 199 Additional Facts ¶ 40). However, Defendants correctly point out that the discussion was prompted by an educational webinar, which cited no authority for the item-specificity requirement, presented by Cigna in its capacity as a durable medical equipment Medicare Administrative Contractor ("MAC").[18] (DE 207 at 7–8). Cigna did not state that the Medicare regulations "required" item-specific AOBs. (DE 207 at 7; DE 199 ¶ 40 (citing Oct. 5, 2009 Cigna presentation DE 197–10 at 22)). In fact, the October 2009 email exchange reported that the presenter emphasized that while "equipment needed to be named specif-ic[ally]," in the AOBs, DMEPOS suppliers "could add 'supplies' to cover any/all supplies related to the specific named equipment." (Oct. 9, 2009 Lincare internal email DE 197–10 at 2).

## (II) *Discussion*

### (II)(A) *Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

---

17. As with nearly all of the allegedly factual disputes relevant to the determination of the instant motion, the Parties disagree about the legal conclusions to be drawn from the facts, but do not dispute the underlying facts. Here, the content of the AOBs signed by the exemplar beneficiaries is undisputed. Likewise, although not germane to the analysis of the pertinent exception to the unsolicited telephone contact proscription, Defendants do not rebut Relators' factual proffer that at least some of the AOBs previously signed by the beneficiaries when they received their oxygen supplies did not contain any language relating to general consent to contact. (DE 199 Additional Facts ¶ 14).

18. CMS enters into agreements with "DME MACs" to administer Medicare Part B. *See* 42 U.S.C. § 1395u(a).

317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Urquilla–Diaz*, 780 F.3d at 1050 (quoting *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir.2014)).

After the movant has met its burden under Rule 56(c), the burden shifts to the nonmoving party who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party "may not rely merely on allegations or denials in its own pleading," but instead must come forward with "specific facts showing a genuine issue for trial." Fed. R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. "Thus, to survive summary judgment, the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla–Diaz*, 780 F.3d at 1050 (citing *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1162 (11th Cir.2006)); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997) (quoting *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.").

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials...." FED. R. CIV. P. 56(c)(1)(A). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir.2008) (quotation marks and citations omitted). However, "the existence of a difficult or complicated question of law, when there is no issue as to the facts, is not a bar to a summary judgment." *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1166 (11th Cir.2003) (quoting *Ammons v. Franklin Life Ins. Co.*, 348 F.2d 414, 417 (5th Cir.1965)).

The Court notes that the Parties are not in complete accord regarding the operative facts, but their disputes either do not pose genuine issues material to the resolution of the motion or are not actually factual in nature. An example of a disputed, but not material, factual issue is the business relationship between Defendants (Holdings and Lincare) and two entities not mentioned or named as parties in the SAC (Med4Home, Inc. and Reliant Pharmacy Services) and how these non-parties participated in the alleged scheme of false billing. (*See, e.g.*, DE 75 ¶ 4; DE 101 ¶ 4; DE 199 ¶ 4; DE 207 ¶ 4 (concerning phone numbers of Med4Home, Inc. and Reliant Pharmacy Services customers)).

■ First, allegations regarding non-parties Med4Home, Inc. and Reliant Pharmacy Services have nothing to do with the exemplars. (*See generally* SAC DE 43; DE 199 Additional Facts ¶¶ 13, 15). Second, claims regarding the previously unidentified entities Med4Home, Inc. and Reliant Pharmacy Services were not pleaded with specificity in the SAC. (*See generally* SAC DE 43). As discussed at the June 19, 2014 and March 19, 2015 status conferences, the pleadings are closed and the Court does not find "extraordinary" grounds justifying the inclusion of addi-

tional parties and claims. (*See* DE 97–1 at 20:17–21:3); *see also Urquilla–Diaz,* 780 F.3d at 1057 (holding that dismissal with prejudice of deficient claims in second amended complaint was appropriate because "[t]hree attempts at proper pleading are enough."). Finally, a relator cannot raise a new theory of the case in response to a dispositive motion when that theory does not appear in the pleadings. *See United States ex rel. Graves v. Plaza Med. Centers Corp.,* Case No. 10–23382–CIV, 2014 WL 5040284, at *4 n. 4 (S.D.Fla. Oct. 8, 2014) (Moreno, J.) (preventing relator from arguing new insider theory for the first time in her omnibus response and dismissing amended complaint, but allowing a second amended complaint). Whether or not the theory may potentially have merit is of no moment because "[a] relator may not assert new theories of liability based on information learned during discovery." *United States ex rel. Estate of Donegan v. Anesthesia Assocs. of Kansas City, PC,* Case No. 4:12–CV–0876–DGK, 2015 WL 3616640, at *7 (W.D.Mo. June 9, 2015). And as the Eleventh Circuit observed in *Keeler,* the district courts must guard against the "situation where a plaintiff does not specifically plead the minimum elements of their allegation, and is able to learn the complaint's bare essentials through discovery." *United States ex rel. Keeler v. Eisai, Inc.,* 568 Fed.Appx. 783, 805 (11th Cir.2014) (quoting *United States ex rel. Clausen v. Laboratory Corp. of Am., Inc.,* 290 F.3d 1301, 1313 (11th Cir.2002)). Consequently, despite the Parties' vigorous disagreement about other entities allegedly included or alluded to in the pleadings, that disagreement has no bearing on the issues regarding the exemplars pending before the Court.

Similarly, the Court need not dwell on the legal disputes presented in the Parties' statements of facts. An example of a nonfactual dispute in the statements of material facts is the Parties' competing interpretation of what weight federal agencies place on tax identification numbers ("TIN" or "EIN") in determining whether an entity is a separate "supplier" under the applicable regulations. (DE 75 ¶ 8; DE 101 ¶ 8; DE 199 ¶ 8; DE 207 ¶ 8). It is an undisputed fact that Diabetic Experts is a d/b/a of Lincare. (DE 75 ¶ 6; DE 101 ¶ 6). However, Relators dispute that Lincare and Diabetic Experts are the same supplier as that term is used in the federal regulations governing Medicare supplier eligibility and billing. *Id.* This is a legal—not factual—issue. Accordingly, there is no genuine issue of material fact preventing the Court from deciding the motion for summary judgment on the six exemplars as a matter of law.

### (II)(B) *Expert Opinion On Legal Conclusions*

■ Before turning to the merits, the Court addresses whether Relators' expert report is appropriately considered with the motion for summary judgment on the exemplars. Federal Rule of Evidence 704 allows an expert to "testify as to his opinion on an ultimate issue of fact," but an expert may not tell the judge or jury what result to reach under the law. *Montgomery v. Aetna Cas. & Sur. Co.,* 898 F.2d 1537, 1541 (11th Cir.1990) (finding error in district court's admission of expert testimony concerning legal conclusions). The Court determines the applicable law and expert opinions regarding the legal standards applicable to a case must be excluded. *City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 565 (11th Cir.1998); *United States v. Hunter,* 373 Fed.Appx. 973, 978 (11th Cir.2010) ("The witness also cannot testify to the legal implications of conduct because the court must be the jury's only source of law.") (citing *Montgomery,* 898 F.2d at 1541). Since Relators' expert Charles Waldhauser's report consists primarily of impermissible legal

conclusions,[19] the Court finds his testimony in this regard to be excludable. *Harcros Chems.*, 158 F.3d at 565; *see also Pleasant Valley Biofuels, LLC v. Sanchez–Medina,* Case No. 13–23046–CIV, 2014 WL 2855062, at *5 (S.D.Fla. June 23, 2014) ("An expert witness may not testify as to the state of the law, however; this is the Court's duty."); *Cordoves v. Miami–Dade County,* 104 F.Supp.3d 1350, 1365–66, Case No. 14–20114–CIV, 2015 WL 2258457, at *12 (S.D.Fla. Mar. 2, 2015) (excluding expert's opinions consisting of impermissible legal conclusions regarding ADA compliance).

Therefore, Defendants' motion to strike Waldhauser's expert report (DE 104) is **GRANTED IN PART.** All opinions in the report regarding the legal standards and regulatory interpretation applicable to this case are stricken. Notwithstanding that determination, the Court agrees with the Parties that Waldhauser's extensive background and experience may make him an appropriate expert witness, able to offer permissible and helpful opinions to the trier of fact. (DE 104 at 2 n. 1; DE 117 at 1, 3). Thus, for the purposes of the instant motion, the Court will consider the non-legal opinions expressed in Waldhauser's report and grant them whatever weight they merit. And, while Waldhauser's impermissible legal conclusions will not be considered by the Court, he may testify regarding other, permissible opinions in his final expert report should any issues remain following the resolution of the instant motion for summary judgment.

### (II)(C) *The False Claims Act*

The False Claims Act "was enacted in 1863 with the principal goal of stopping the massive frauds perpetrated by large private contractors during the Civil War." *Vt. Agency of Natural Res. v. Stevens,* 529 U.S. 765, 781, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (quotations omitted); *see also Ragsdale v. Rubbermaid, Inc.,* 193 F.3d 1235, 1237 n. 1 (11th Cir.1999) ("The purpose of the Act, then and now, is to encourage private individuals who are aware of fraud being perpetrated against the government to bring such information forward.") (citation omitted). The False Claims Act imposes liability on any person who, *inter alia:*

(a)(1)(A) knowingly[20] presents, or causes to be presented, a false or fraudulent claim[21] for payment or approval; or

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material[22] to a false or fraudulent claim.

31 U.S.C. § 3729.

 The False Claims Act does not deal with all non-compliance and "[t]he

---

**19.** *See, e.g.,* "It is my opinion that [Diabetic Experts] has violated Supplier Standard No. 11, and, therefore, has submitted false claims for payment to Medicare." (DE 100–8 at 6).

**20.** "Knowingly" means a person who (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b).

**21.** "Claim" means "any request or demand, whether under a contract or otherwise, for money or property that is presented to an officer, employee, or agent of the United States; or is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money or property requested or demanded." 31 U.S.C. § 3729(b).

**22.** "Material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b).

fact that there may have been a violation of the laws governing Medicare ... is not enough, standing alone, to sustain a cause of action under the False Claims Act." *United States ex rel. Ortolano v. Amin Radiology,* Case No. 5:10–CV–583–OC–PRL, 2015 WL 403221, at *3 n. 3 (M.D.Fla. Jan. 28, 2015) (citing *Mikes v. Straus,* 274 F.3d 687, 697 (2nd Cir.2001)). Instead, there must be a falsehood that affects the government's willingness to pay, because "[i]mproper practices standing alone are insufficient." *Hopper,* 588 F.3d at 1328. To prevail, a relator must provide details of a link between improper practices and the submission of false claims. *See United States ex rel. Klusmeier v. Bell Constructors, Inc.,* 469 Fed. Appx. 718, 721 (11th Cir.2012).

■ False Claims Act liability should not be invoked lightly; it is "not a vehicle to police technical compliance with complex federal regulations." *United States ex rel. Hobbs v. MedQuest Assocs., Inc.,* 711 F.3d 707, 717 (6th Cir.2013) (quoting *United States ex rel. Williams v. Renal Care Grp., Inc.,* 696 F.3d 518, 532 (6th Cir.2012)). Nonetheless, "a process tainted by fraud impairs the integrity of the government program." *United States ex rel. Sharp v. Consol. Med. Transp., Inc.,* Case No. 96 C 6502, 2001 WL 1035720, at *8 (N.D.Ill.2001). Accordingly, in *Clausen,* the Eleventh Circuit sought a balanced approach: "[t]he False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *Clausen,* 290 F.3d at 1311. The Eleventh Circuit recently reiterated that liability under the False Claims Act does not arise solely from "the disregard of government regulations or failure to maintain proper internal procedures." *Urquilla–Diaz,* 780 F.3d at 1045, 1051–52 (quoting *Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1012 (11th Cir.2005)); *see also Jallali v. Nova Se. Univ., Inc.,* 486 Fed.Appx. 765, 766 (11th Cir.2012) (same). And the Second Circuit admonished that the False Claims Act is not a "blunt instrument" to be used for every false certification of compliance [23] with the vast and complicated Medicare program. *Mikes,* 274 F.3d at 699 (cited with approval by *Wilkins,* 659 F.3d at 307).

In Count I, Relators argue that Diabetic Experts knowingly submitted false claims for payment—a so-called presentment claim—because the claims arose out of calls with beneficiaries that violated the unsolicited telephone contact rules and because Diabetic Experts used AOBs that could only be used by Lincare. In Count II, Relators argue that Holdings knowingly provided Diabetic Experts with improper sales leads generated from Holdings' database of patient information and Diabetic Experts knowingly used those leads to make the unsolicited sales calls alleged in Count I; and Holdings knowingly provided the purportedly false AOBs to Dia-

---

**23.** Other circuits recognizing the theory of implied false certification (discussed below) note that it should not be applied to the entire universe of possible Medicare violations. As the Third Circuit observed in *Wilkins,* "the implied certification theory of liability should not be applied expansively, particularly when advanced on the basis of FCA allegations arising from the Government's payment of claims under federally funded health care programs." *Wilkins,* 659 F.3d at 307. This is because it would be "absurd" to allow False Claims Act liability to attach for any regulatory violation merely because regulators could terminate the billing privileges of a facility or supplier for such a violation. *See United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.,* 764 F.3d 699, 712 (7th Cir.2014) (vacating jury verdict and remanding with instruction that judgment be entered in favor of defendant nursing center).

betic Experts, which Diabetic Experts used to submit false claims. Count II is commonly referred to as a make-or-use claim. The two types of claims in the two counts have different elements, but both require objective falsehood and that the defendant act knowingly, that is to say, with scienter. *R & F Props.*, 433 F.3d at 1355; *Mastej*, 591 Fed.Appx. at 710; *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, Case No. 2:11–CV–89–FTM–29DNF, 2013 WL 1149255, at *6 (M.D.Fla. Mar. 19, 2013) *aff'd in part, rev'd in part on other grounds*, 591 Fed.Appx. 693 (11th Cir.2014) (citing *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047–48 (9th Cir.2012)); *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir.2008); *A1 Procurement, LLC v. Hendry Corp.*, Case No. 11–23582–CIV, 2012 WL 6214546, at *4 (S.D.Fla.2012) ("A fundamental requirement of the FCA, regardless of the section allegedly violated, is that the false or fraudulent claims or statements at issue must be objectively false.").

Thus, as to Count I, the Court must determine whether Diabetic Experts had the requisite scienter when it called the six beneficiaries and used the Lincare AOBs to submit claims following those calls; and for Count II, whether Holdings and Diabetic Experts had the requisite scienter when they shared the patient information database and allegedly used false AOBs. For the AOBs to have been "false," either the six exemplar beneficiaries must not have had adequate notice that Diabetic Experts would submit their claim or the items provided must have been new pieces of equipment such that the regulations would preclude using the old AOBs.

**(II)(C)(1) *Factually False Claims Or Legally False Claims***

In order to succeed on a presentment claim, a relator must prove three things: (1) a false or fraudulent claim (2) was presented, or caused to be presented, by the defendant to the United States for payment or approval (3) with knowledge that the claim was false. *R & F Props.*, 433 F.3d at 1355 (citing 31 U.S.C. § 3729(a)(1) (pre-FERA); 31 U.S.C. § 3729(a)(1)(A) (post-FERA)). In order to prevail on a make-or-use claim, a relator must establish:[24] "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Urquilla–Diaz*, 780 F.3d at 1045. These elements, including the scienter/knowledge element, must be proven by a preponderance of the evidence. *See* 31 U.S.C. § 3731(d); *Absher*, 764 F.3d at 710–11. There are two types of false or fraudulent claims that may be alleged by plaintiffs pursuing presentment or make-or-use claims under the False Claims Act: factually false claims and legally false claims.

A factually false claim occurs, for example, when a supplier submits a claim that misidentifies the goods supplied or requests reimbursement for goods that it never provided. *See Mikes*, 274 F.3d at 697. Simply put, the supplier falsely bills the government for something not received. *See, e.g., United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 114 (2d Cir.2010), *rev'd on other grounds* 563 U.S. 401, 131 S.Ct. 1885, 179 L.Ed.2d 825 (2011). Courts agree that

**24.** The Eleventh Circuit in *Urquilla–Diaz* did not consider whether these elements might be different in post-FERA cases concerning make-or-use claims pending on or after June 7, 2008. As referenced, *supra* note 4, FERA created an explicit materiality element of § 3729(a)(1)(B). Because the Court resolves this motion without deciding the question of materiality, the Court applies these elements to the six exemplars, notwithstanding the fact that the claims arise under the post-FERA False Claims Act.

application of the False Claims Act in factually false cases is "fairly straightforward." *Amin Radiology*, 2015 WL 403221, at *3; *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir.2008); *Kirk*, 601 F.3d at 114. Here, there are no allegations that the supplies were not provided or that the supplies provided were counterfeit or of inferior quality.

Although Relators claim in their supplemental facts that Defendants' phone calls to Medicare beneficiaries regarding diabetic supplies "result[ed] in overutilization and frequent overbilling of Medicare," this claim is not supported by the record. (DE 199 Additional Facts ¶3). The citations[25] refer to a collection of redacted, unlabeled, and barely legible screenshots from Defendants' customer service interface, which show that some customers had supplies on hand when they received the shipments. But these screenshots do not show that the supplies sent to these customers went to waste, that Defendants persisted in shipping additional supplies when clearly told to stop, or that Medicare was double-billed for supplies. (DE 64-2; DE 64-3; DE 195-5). And the excerpts from Relator Phalp's deposition cited in support of this proposition do not demonstrate overutilization, but instead describe how calls were made without Relators knowing that the Lincare customers were diabetic. (Oct. 16, 2014 Gerry Phalp Deposition DE 197-5 at 89:12-23). Thus, Relators' unsupported claims regarding overbilling or overutilization do not affect the Court's summary judgment analysis regarding legally false claims. *See* Fed.R.Civ.P. 56(e); S.D. Fla. L.R. 56.1.

■ A legally false claim is actionable when the supplier has falsely certified compliance with the applicable statutes and regulations, but nevertheless has submitted a claim. *Mastej*, 591 Fed.Appx. at 705-06. "The violation of the regulations and the corresponding submission of claims for which payment is known by the claimant not to be owed make the claims false." *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir.2005) (affirming denial of a motion to dismiss in anti-kickback statute case and finding that alleged kickbacks disqualified the defendants' medical services from reimbursement under the Medicare program). The Eleventh Circuit recognizes both varieties of false certification: express false certification and implied false certification. *See Keeler*, 568 Fed.Appx. at 798-99; *Urquilla-Diaz*, 780 F.3d at 1045 (expressly adopting the false certification theory of liability).

### (II)(C)(2) *Liability For False Certification*

■ Although only implied certification is at issue here, it is more easily understood in juxtaposition with express certification. Express certification means that the supplier has certified compliance with applicable laws and regulations as part of the claims submission process. *Keeler*, 568 Fed.Appx. at 798-99; *Mastej*, 591 Fed. Appx. at 702, 705 n. 19 (discussing express certification in context of make-or-use claims). Verification of compliance with applicable laws and regulations is not always expressly required as part of the submission of claims for payment; sometimes it may only be an implied condition of payment or a condition of eligibility to participate in Medicare. *Urquilla-Diaz*, 780 F.3d at 1044-45; *McNutt*, 423 F.3d at 1259. As the Court explained in *Keeler*, an implied certification theory "recognizes

---

**25.** The citations were not accompanied by pincites or parenthetical explanation. *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) (quoting *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir.2003) ("[J]udges are not like pigs, hunting for truffles buried in briefs.") (internal quotation marks omitted).

that the FCA is violated where compliance with a law, rule, or regulation is a prerequisite to payment but a claim is made when a participant has engaged in a knowing violation." *Keeler,* 568 Fed.Appx. at 799 (citing *Wilkins,* 659 F.3d at 313); *Ebeid ex rel. United States v. Lungwitz,* 616 F.3d 993, 998 (9th Cir.2010) ("Implied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim.").

There is no allegation in the SAC that Holdings or Diabetic Experts expressly certified compliance with supplier standards when submitting the six claims at issue.[26] However, the application submitted to CMS in order to obtain billing privileges for Diabetic Experts certified that Diabetic Experts would comply with applicable statutes and regulations and acknowledged that Medicare conditioned payment of claims on continued compliance. (*See* 2004 CMS–855S enrollment form DE 75–2 at 34; *see also, e.g.,* electronic data interchange ("EDI") transmission agreement DE 195–7 at 6). As the Third Circuit held in *Wilkins v. United Health Group, Inc.,* if a plaintiff can prove that the defendant submitted claims for payment at a time when defendant was "knowingly violat[ing] a law, rule, or regulation which was a condition for receiving payment from the Government," that is sufficient to justify "relief under an im-

plied false certification theory of liability." *Wilkins,* 659 F.3d at 313.

 Courts limit implied false certification claims to situations where compliance is the *sine qua non* of receipt of federal funding. *Urquilla–Diaz,* 780 F.3d at 1052; *United States ex rel. Osheroff v. Tenet Healthcare Corp.,* Case No. 09–22253–CIV, 2013 WL 1289260, at *4 (S.D.Fla. Mar. 27, 2013); *United States ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166, 1172 (9th Cir.2006); *see also McNutt,* 423 F.3d at 1259; *Clausen,* 290 F.3d at 1311. In *Mikes v. Straus,* an oft-cited, pre-FERA case developing what has come to be called the condition of payment analysis, the Second Circuit observed that it would be anomalous for an act aimed at retrieving ill-gotten funds to attach liability to false certifications, "when the alleged noncompliance would not have influenced the government's decision to pay." *Mikes,* 274 F.3d at 697.

Although the telephone contact statute and regulation are enforced in slightly different ways, the Court assumes for purposes of this discussion that certification of compliance with the supplier standards affects the government's decision to pay claims and therefore does not undertake the *Mikes* analysis. (*See* Supplier Enrollment Application DE 75–2 at 34 (conditioning payment of claims upon the "the claim and the underlying transaction complying with [Medicare] laws, regulations, and program instructions ... and on the supplier's compliance with all applicable conditions of participation in Medicare.")).[27] And it is

---

**26.** The only reference to certification in the SAC is that the application for billing privileges required compliance with supplier standards. (*See* SAC DE 43 ¶ 82)*, 42 C.F.R. § 424.57(c) ("Application certification standards. The supplier must meet and must certify in its application for billing privileges that it meets and will continue to meet the following standards.").

**27.** Another court of this district has noted that such certifications highlight the problem inherent in the condition of payment analysis. If compliance with all laws and regulations is a condition of participation in the program and the supplier-to-be certifies its understanding at the outset that compliance is a condition of payment, then compliance with all the laws and regulations of the Medicare universe is both a condition of participation and of

beyond cavil that a basic requirement for the payment of all claims is that they be signed by the beneficiary or that the supplier have an appropriate AOB on file. *See* 42 C.F.R. § 424.32; § 424.36 ("[T]he purpose of the signature is to authorize a provider or supplier to submit a claim to Medicare.").

Inasmuch as the Court assumes that the condition of payment or materiality element of the False Claims Act analysis is satisfied, the Court must determine whether the six exemplars are instances where Defendants submitted claims to the government, certified compliance, or made or used records with knowledge: 1) that Defendants were in violation of the unsolicited telephone contact proscription; or 2) that the AOBs did not meet Medicare requirements. Defendants argue that Relators' theory of liability rests on two faulty premises: 1) that Lincare and Diabetic Experts are two distinct legal suppliers for the purposes of providing DMEPOS supplies to beneficiaries and submitting claims for payment; and 2) that the diabetic testing supplies provided to the six exemplar beneficiaries are new pieces of "equipment." The Court considers these arguments in turn.

### (II)(C)(3) *Diabetic Experts: Subpart or Separate Supplier?*

The regulatory identity of the supplier is critical to the disposition of the instant motion. The Court starts from an uncontroverted fact sworn to by Holdings' Director of Taxes: there is no separate Diabetic Experts of America company, affiliate, or entity (DE 75 ¶ 12; Crisp Aff., DE 75–1 ¶ 16); Diabetic Experts is a fictitious name used by Lincare (DE 75 ¶ 12).

The Court must determine whether, pursuant to the Medicare statutes and regulations, Diabetic Experts is a separate and independent supplier from Lincare. If Lincare and Diabetic Experts are the same supplier, then the telephone contacts with the six exemplar beneficiaries were not violations; Lincare sold each a covered item of DMEPOS in the fifteen months prior to the billing at issue. Likewise, if they are the same supplier, Diabetic Experts' submission of a claim based on an AOB[28] provided by the exemplar beneficiary to Lincare also was not a violation.[29] In summary, if Lincare and Diabetic Experts are one supplier, the claims submitted were not false and neither Holdings nor Diabetic Experts made or used false records when Diabetic Experts used Lincare's AOBs or accessed Lincare customer data that was managed by Holdings.

### (II)(C)(3)(a) *Interpretation Of Medicare Statutes And Regulations*

The Court starts with the statutory text and proceeds from the "under-

payment. In such a situation, the *Mikes* analysis loses much of its utility. *See Osheroff*, 2013 WL 1289260, at *4 (reasoning that there is a distinction without a difference between conditions of participation and payment because promises to comply with a federal program's participation agreement are de facto conditions of payment for the basic reason that, if the participant had not agreed to comply with them, it would never have gotten paid under the program); *see also Urquilla–Diaz*, 780 F.3d at 1052 ("[T]he relevant certification of compliance must be both a prerequisite to obtaining a government benefit, and a *sine qua non* of receipt of government fund-

ing.") (citations and internal quotations omitted).

**28.** The Court discusses whether the diabetic testing supplies provided to the exemplar beneficiaries were supplies or equipment in the context of the AOBs, below.

**29.** In this discussion as all others, the Court's determination bears only on liability under the False Claims Act. The Court expresses no opinion regarding whether administrative or any other type of action is warranted or appropriate regarding any of Lincare's practices.

standing that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer,* —— U.S. ——, 133 S.Ct. 1886, 1893, 185 L.Ed.2d 1003 (2013) (citation omitted); *Sumpter v. Sec'y of Labor,* 763 F.3d 1292, 1296 (11th Cir.2014) (quoting *Schwarz v. City of Treasure Island,* 544 F.3d 1201, 1214 (11th Cir.2008)). Courts' construction should avoid rendering any clause, sentence, or word superfluous, void, or insignificant. *See United States v. Aldrich,* 566 F.3d 976, 978 (11th Cir.2009). Words must be read "in their context and with a view to their place in the overall statutory scheme," because a court's duty, "after all, is to construe statutes, not isolated provisions." *King v. Burwell,* —— U.S. ——, 135 S.Ct. 2480, 2489, 192 L.Ed.2d 483 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000); *Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson,* 559 U.S. 280, 290, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010)) (internal quotation marks omitted).

■ "The first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute." *Shotz,* 344 F.3d at 1167 (citation and internal quotation omitted). Similarly, when construing a regulation, a court looks to the "regulation's plain language" and may consider "other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *see also Urquilla–Diaz,* 780 F.3d at 1053 (citing, without discussing degree of deference, agency responses to commentary published along with final regulation in the Federal Register).

■ Statutes may lack sufficient clarity for practical application and "[e]xecutive

actors often must interpret the enactments Congress has charged them with enforcing and implementing." *Gonzales v. Oregon,* 546 U.S. 243, 255, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006). Accordingly, courts defer when the "regulations g[i]ve specificity to a statutory scheme the Secretary was charged with enforcing." *Id.* at 257, 126 S.Ct. 904 (internal citation omitted). In general, agency interpretations are "entitled to respect ... to the extent that those interpretations have the power to persuade." *R & F Props.,* 433 F.3d at 1357 (internal citation and quotation marks omitted); *Wis. Dept. of Health & Family Servs. v. Blumer,* 534 U.S. 473, 497, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002) (agency's position, even if only presented in a proposed rule, "warrants respectful consideration.").

■ At least three levels of deference are relevant to this discussion of the Medicare statutes and regulations. *Chevron* deference applies to agency interpretations of ambiguous statutes; *Auer* deference applies to agency interpretations of the agency's own ambiguous regulations; and *Skidmore* deference applies to less formal agency guidance documents and opinions. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *United States v. Mead Corp.,* 533 U.S. 218, 234–35, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *Ramos–Barrientos v. Bland,* 661 F.3d 587, 598 (11th Cir.2011) ("Even if these interpretations [of the regulations] are not entitled to deference under *Chevron* or *Auer,* they are persuasive under *Skidmore.*"); *Arriaga v. Fla. Pac. Farms, L.L.C.,* 305 F.3d 1228, 1238 (11th Cir.2002) (recognizing that *Skidmore* standard applicable to

courts when considering the deference to be accorded to agency rulings, interpretations and opinions, dictates that the "weight of such [an agency] judgment in a particular case, will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.").

■ Under *Chevron,* courts give agency interpretations of an ambiguous statute "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778. Although agency interpretations of ambiguous regulations contained in policy statements, manuals, and enforcement guidelines are not entitled to the force of law, *R & F Props.,* 433 F.3d at 1357 (citing *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)), they are also "controlling unless plainly erroneous or inconsistent with the regulation." *Auer,* 519 U.S. at 461, 117 S.Ct. 905. Under *Skidmore,* a court grants weight to an agency interpretation according to its "power to persuade." *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161. In *Sarasota Mem'l Hosp. v. Shalala,* 60 F.3d 1507 (11th Cir. 1995), the Eleventh Circuit observed that deference to an agency interpretation is all the more appropriate when it concerns a complex and highly technical regulatory program, like Medicare, "in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Id.* at 1511 (citations and internal quotation omitted); *accord Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 1002–03, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (reaffirming the principle of judicial deference to agency interpretations on questions involving subject matter that is technical, complex, and dynamic, because

the agency is in a far better position to address such questions than the courts are); *see also Rehabilitation Ass'n of Va., Inc. v. Kozlowski,* 42 F.3d 1444, 1450 (4th Cir.1994) (wryly observing that the various statutes and regulations governing Medicare are "among the most completely impenetrable texts within human experience").

The Secretary of Health and Human Services is charged by Congress with administering the Medicare statute. *See Almy v. Sebelius,* 679 F.3d 297, 299 (4th Cir.2012) (citing 42 U.S.C. § 1395ff(a)(1)); *see also* 42 U.S.C. § 1395hh. To that end, "Congress vested in the Secretary large rulemaking authority" and the Medicare Act authorizes the Secretary to issue regulations "defining reimbursable costs and otherwise giving content to the broad outlines of the Medicare statute." *Sebelius v. Auburn Reg'l Med. Ctr.,* —— U.S. ——, 133 S.Ct. 817, 826, 184 L.Ed.2d 627 (2013); *Tex. Alliance for Home Care Servs. v. Sebelius,* 681 F.3d 402, 405 (D.C.Cir.2012) (citing *Thomas Jefferson Univ.,* 512 U.S. at 506–07, 114 S.Ct. 2381). CMS, in turn, is given primary responsibility for regulating Medicare. *See R & F Props.,* 433 F.3d at 1351.

■ As the Court explained in *Chevron,* "[t]he power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. CMS has the relevant expertise and its published guidance and responses to specific comments—which are a byproduct of the rulemaking process—regarding supplier identification and standards should be accorded due weight. *See, e.g., United States ex rel. Smith v. Boeing Co.,* Case No. CIV.A. 05–1073–MLB, 2014 WL 5025782, at *24

(D.Kan. Oct. 8, 2014) ("[The agency] has the far-reaching technical expertise needed to judge compliance with its regulations" and to assess the impact of non-compliance.); *United States v. Shaw*, 106 F.Supp.2d 103, 113 (D.Mass.2000) (noting that a "court is wise to consider" the agency's interpretation of the regulatory scheme discussed in the final rule).

■ Nonetheless, judicial deference to CMS' interpretation is not unlimited. It does not extend, for example, to an additional layer of analysis, such as when a Medicare contractor offers a non-binding interpretation of Medicare compliance manuals. *See Elgin Nursing & Rehab. Ctr. v. U.S. Dept. of Health & Human Servs.*, 718 F.3d 488, 493 (5th Cir.2013) (declining to accord deference to an agency's "interpretation of its manual interpreting its interpretive regulation."). And substantive changes in CMS manuals, interpretative rules, and general guidelines are not applied retroactively. *See* 42 U.S.C. § 1395hh(e). These limits are consonant with the recent Supreme Court decision in *Young v. United Parcel Serv., Inc.*, —— U.S. ——, 135 S.Ct. 1338, 191 L.Ed.2d 279 (2015), where the Court reaffirmed the principle that agency rulings, interpretations, and opinions are accorded persuasive weight due in part to their "consistency." *Young*, 135 S.Ct. at 1352.

### (II)(C)(3)(b) *The Regulations Contemplate An Organization Like Lincare*

In the final rule establishing the supplier standards for DMEPOS suppliers, CMS [30] opined that "[t]he single most striking characteristic of Medicare DMEPOS suppliers is their diversity." Medicare Program; Additional Supplier Standards, 65 Fed. Reg. 60366–01, 60374 (Oct.

11, 2000) (to be codified at 42 C.F.R. Part 424). CMS illustrated the point with this example: "a firm dealing with the oxygen needs of the medical community may add a department that provides oxygen services and supplies as a medical supply as a logical extension of an existing business." *Id.*

In order to describe the relationship between the parent organizational health care providers and the separate physical locations at which durable medical equipment is actually dispensed to patients under the NPI regulations, CMS referred to the different components and physical locations as "subparts." HIPAA Administrative Simplification: Standard Unique Health Identifier for Health Care Providers, 69 Fed.Reg. 3434–01, 3438 (Jan. 23, 2004) (to be codified at 45 C.F.R. Part 162). Furthermore, later interpretation from CMS is consistent with the understanding that DMEPOS suppliers like Lincare may be:

> made up of components that ... have separate physical locations where health care is furnished. These components and physical locations are not themselves legal entities, but are part of the organization health care provider (which is a legal entity). The NPI final Rule refers to components and locations as subparts.

(CENTERS FOR MEDICARE AND MEDICAID SERVICES, MEDICARE LEARNING NETWORK, THE NATIONAL PROVIDER IDENTIFIER (NPI): WHAT YOU NEED TO KNOW (2012) DE 75–3 at 85). With regard to subparts, Medicare requires suppliers to obtain an NPI for any subpart "that would be a covered health care provider if it were a separate legal entity." 45 C.F.R. § 162.410(a)(1); (DE 75 ¶ 14).

---

**30.** The rule was promulgated by the Health Care Financing Administration, the predecessor to CMS.

Subparts might function with a relatively high degree of independence from the health care organization of which they are a part. For example, subparts "might conduct their own standard transactions, might be at the same or at a different address than the organization provider 'parent,' [or] might furnish a type of service different from the organization provider 'parent.'" *See* Centers for Medicare and Medicaid Services, FAQ 1965, https://questions.cms.gov/faq.php?id=5005 & faqId=1965 (last visited Mar. 11, 2015). Although existing as subparts of the supplier, which is the relevant legal entity under the regulations, "[t]hese subparts or business units might be required by Federal regulations to have unique identifiers for billing purposes." *Id.*

#### (II)(C)(3)(c) *Lincare, Inc. d/b/a Diabetic Experts Is Not A Separate Supplier*

■ The allegations of non-compliance in the SAC depend on the premise that Diabetic Experts is not a subpart of Lincare, but is a separate supplier altogether. If that premise is incorrect, there is no cognizable violation stated against Holdings in Count If or against Diabetic Experts in Counts I or II for the telephone contacts and use of Lincare's AOBs. After a thorough review of the record, the Court does not view the question of whether Lincare and Diabetic Experts are the same entity for the purposes of Medicare to be a question of disputed fact. It is undisputed that Diabetic Experts is a d/b/a of Lincare. (DE 75 ¶ 6; DE 101 ¶ 6). Thus, whether Lincare and Diabetic Experts are separate suppliers for purposes of False Claims Act liability turns on an analysis of the Medicare statutes, regulations, rules, and related commentary and regulatory history.

Defendants' position that Diabetic Experts is not a separate legal entity from Lincare is consistent with both the agency discussion in the final rule establishing the NPI and the agency interpretation of that rule. Relators have not presented the Court with any authority suggesting that Diabetic Experts is anything other than a subpart of Lincare. The administrative appeal decision cited by Relators stands for the unremarkable idea that all Medicare supplier locations must comply with the Medicare supplier standards. *See PSI Premier Specialties, Inc. d/b/a Med. Express PSI,* Dept. of Health and Human Servs. Depart. Appeals Board Decision No. CR2833 (June 18, 2013).

Lincare is a DMEPOS supplier that at one time sold oxygen supplies to the six exemplar beneficiaries. Diabetic Experts is not a separate supplier, but is a d/b/a of Lincare that sells diabetic testing supplies; "[d]oing business as" means a company is using an assumed name, "it signals that the business may be licensed or incorporated under a different name." Black's Law Dictionary 454 (9th ed.2009); *see also* 8 Fletcher Cyclopedia of the Law of Private Corporations § 3831 (revised ed. 1992 & Supp.1999) ("[U]sing d/b/a or 'doing business as' to associate an assumed or fictitious name with a corporation does not, without more, create a separate legal entity different from the corporation."); *Snowden v. CheckPoint Check Cashing,* 290 F.3d 631, 634 n. 2 (4th Cir.2002) (noting that a trade name is not a separate legal entity); *Bauer v. Pounds,* 61 Conn.App. 29, 762 A.2d 499, 503 (2000) ("It appears well settled that the use of a fictitious or assumed business name does not create a separate legal entity and that the designation d/b/a is merely descriptive of the person or corporation who does business under some other name.") (internal quotation marks, ellipses, and alterations omitted); *Am. Express Travel Related Servs. Co. v. Berlye,* 202 Ga.App. 358, 414 S.E.2d 499, 501 (1991) ("The use of d/b/a or 'doing business as' to associate a tradename with

the corporation using it does not create a legal entity separate from the corporation but is merely descriptive of the corporation."). Furthermore, the Parties have directed the Court to no authority for the proposition that doing business under another name creates a separate legal entity for the purposes of eligibility to bill Medicare. *See generally Ames v. Choice Advantage Corp.*, Case No. 07CV5372RRMSMG, 2009 WL 3401737, at *2 (E.D.N.Y.2009) ("[A] corporation doing business under multiple names remains a single entity, and one that is liable for all of its obligations, regardless of the name it used when undertaking them.").

To support the allegation that Lincare and Diabetic Experts submit claims to Medicare as separate suppliers enrolled in the Medicare program, the SAC and Relators' statements of fact identify various differences between certain business practices of Lincare and Diabetic Experts. (*See* SAC DE 43; DE 101; DE 199). Diabetic Experts sells a different type of product than Lincare. Diabetic Experts "operates independently from Lincare" and "sells and markets completely separate lines of products;" Lincare sells oxygen supplies while Diabetic Experts sells diabetic supplies. (DE 101 ¶¶ 12, 21). Lincare does not have other subparts that sell diabetic supplies: "[n]o Lincare, Inc. location, other than Diabetic Experts, however, provides diabetic testing equipment or supplies." (DE 101 Additional Facts ¶ 8; DE 199 Additional Facts ¶ 10). Diabetic Experts filled out their claims forms with the name Diabetic Experts, Diabetic Experts' unique identifying numbers (*e.g.*, the Diabetic Experts NPI), and Diabetic Experts' unique account number. (DE 101 ¶¶ 6, 12; DE 101 Additional Facts ¶¶ 9, 11, 16; DE 199 Additional Facts ¶¶ 6, 11, 15, 26).

However, Diabetic Experts supervisors took direction from and ultimately answered to Lincare regional managers. (SAC DE 43 ¶ 43). Furthermore, while it is undisputed that Lincare and Diabetic Experts maintain different account numbers for billing beneficiaries and that payments from Medicare are routed to different bank accounts for Lincare and Diabetic Experts, (DE 101 Additional Facts ¶ 14; DE 199 Additional Facts 2, 26), the revenue from Diabetic Experts is all reported to the IRS under Lincare's EIN. (DE 101 ¶ 12). Similarly, although the six exemplar claims were submitted pursuant to Diabetic Experts' EDI transmission agreements, (DE 199 Additional Facts ¶¶ 15, 16), those EDI transmission agreements reveal that the entity identified as responsible for the claim is "Lincare, Inc., d/b/a Diabetic Experts of America." (DE 195-7 at 4; DE 199 Additional Facts ¶ 16). Likewise, Diabetic Experts' correspondence with the MACs confirms that Lincare does business as Diabetic Experts. (*See, e.g.*, DE 195-8 at 2). Against this factual backdrop, the Court addresses the pertinent Medicare regulations and agency interpretation regarding DMEPOS suppliers.

First, along with the NPI and NSC number, the EIN is the "basic identification number that [CMS] use[s] to distinguish between suppliers." Medicare Program; Additional Supplier Standards, 65 Fed.Reg. 60366-01, 60367 (Oct. 11, 2000) (to be codified at 42 C.F.R. Part 424). CMS expressly permits a DMEPOS supplier to enroll multiple "practice locations" using a single tax identification number. *See* Medicare Program; Establishing Additional Medicare Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) Supplier Enrollment Safeguards, 75 Fed.Reg. 52629-01, 52632 (Aug. 27, 2010) (to be codified at 42 C.F.R. Part 424). But this carries a serious risk for a large supplier organization: "If the DMEPOS supplier makes the business decision

to enroll multiple practice locations under the same TIN, a revocation by the NSC of this TIN will necessitate the revocation of related businesses associated with that TIN." *Id.*

Second, simply having a unique NPI does not make Diabetic Experts a separate DMEPOS supplier. This is because, "[t]he health care provider numbers sometimes represent the actual health care provider that furnishes health care, but may also represent the health care provider's service locations, corporate headquarters, specialties, pay-to arrangements, or contracts." HIPAA Administrative Simplification: Standard Unique Health Identifier for Health Care Providers, 69 Fed.Reg. 3434-01, 3436-37 (Jan. 23, 2004) (to be codified at 45 C.F.R. Part 162). As discussed above, NPPES may assign an NPI "to a subpart of a health care provider," on request "if the identifying data for the subpart are unique." 45 C.F.R. § 162.408(a)(1); § 162.408(g). Lincare did precisely this for Diabetic Experts and was given an NPI by NPPES. (DE 75 ¶ 15). The regulations required Diabetic Experts to obtain an NPI in order to bill Medicare for DMEPOS provided to beneficiaries. *See* 45 C.F.R. § 162.410. Lacking an NPI is proof that a location cannot properly bill Medicare, but having an NPI does not prove that an entity is a separate supplier for the purposes of billing Medicare. The fact of an NPI shows that an entity *can* bill Medicare, but it does not explain *why* that entity can do so. And the same is true for obtaining NSC numbers. *See* 42 C.F.R. § 424.57 (providing that a subpart with unique identifying data could also apply for an NSC number if it met the requirements for DMEPOS suppliers generally). A subpart seeking an NSC number is subjected to review, after which NSC notifies the subpart regarding its enrollment decision and assigns an NSC number to it.

Moreover, CMS' responses to comments on the NPI rule support the conclusion that Diabetic Experts is a subpart of Lincare, and not a separate supplier. CMS recognized that Congress intended to accommodate health care providers that "operate at multiple locations and/or provide multiple types of health care services, and intended that the identifier standard take these variations in circumstance into account. We accommodate this language by requiring covered health care providers to obtain NPIs for subparts of their organizations." HIPAA Administrative Simplification: Standard Unique Health Identifier for Health Care Providers, 69 Fed.Reg. 3434-01, 3438 (Jan. 23, 2004) (to be codified at 45 C.F.R. Part 162). CMS stated in no uncertain terms, "[t]he subparts are simply parts of the legal entity. The legal entity—the covered entity—is ultimately responsible." *Id.* at 3439. When the regulations were crafted, CMS considered the creation of sub-IDs under each NPI such that the healthcare provider "might use the sub-IDs for different physical locations [or] subparts." *Id.* at 3440. Ultimately, it decided not to create a sub-ID system and instead allowed subparts to obtain an NPI. *Id.* Lincare organized this segment of its business consistently with the 2004 agency interpretation. Lincare has "over 800 subpart locations operating throughout the United States, each with its own unique NPI number." (Murphy Aff. DE 195-6 ¶ 9).

Finally, the supplier standards, state statutes, and federal regulations mandate enrollment or registration of different physical locations. *See* 42 C.F.R. § 424.57(b)(c). Diabetic Experts operates in Missouri and had Lincare failed to register its d/b/a, it would have run afoul of the standards requiring enrollment of each separate physical location and requiring the supplier to operate its business in compliance with applicable state licensure and

regulatory requirements. *See* 42 C.F.R. § 424.57(c)(1)(ii). Lincare was obligated, under Missouri Statute § 417.200, to register Diabetic Experts of America as a fictitious name being used in the state. Mo. Stat. § 417.200 ("[I]t shall be unlawful for any person to engage in or transact any business in this state under a fictitious name without first registering same with the secretary of state as herein required.").

Therefore, a unique name, NPI, or NSC number for Diabetic Experts does not mean that Diabetic Experts is a separate supplier, but is consistent with Defendants' business decision to enroll Diabetic Experts as a subpart of Lincare. The fact that Diabetic Experts operates in a different location than Lincare does not undercut the notion that Diabetic Experts is a subpart; it is one of the reasons Diabetic Experts was required to obtain its own NPI and NSC numbers. *See* 42 C.F.R. § 424.57(b) (providing that the parent supplier must enroll each "separate physical location it uses to furnish Medicare-covered DMEPOS."). The Subpart Paper explicitly set forth CMS' position regarding unique Medicare numbers for subparts: "Medicare regulations require that each practice location of a supplier of DMEPOS (if it has more than one) must, by law, be separately enrolled in Medicare and have its own unique Medicare identification number." Subpart Paper at 8. The new Missouri location was a subpart of the existing supplier and the Medicare 855S supplier enrollment form, without which Diabetic Experts could not apply to be eligible to bill Medicare, bears the name "Lincare, Inc., d/b/a Diabetic Experts of America." (DE 195–6 at 20).

Relators argue that "it is clear that the companies [31] operating under Lincare

Holdings (including Diabetic Experts) are incestuously distributing patient information and sharing documents and staff without regard for corporate formality." (DE 100 at 1). Relators are partially right. But the sharing of information they have characterized as "incestuous" is the underpinning of Defendants' best argument: Lincare and Diabetic Experts are the same supplier. The facts in the record regarding the six exemplars compel the conclusion that Diabetic Experts was created, enrolled, and operated precisely as Defendants have claimed: "a new location for a currently enrolled DMEPOS supplier." (2004 Medicare 855S supplier enrollment form DE 195–6 at 19–20; DE 75 ¶ 12). CMS is absolutely clear that "[a] subpart is not itself a separate legal entity, but is a part of a covered organization health care provider that is a legal entity." Subpart Paper at 2. Therefore, the Court concludes as a matter of law that Diabetic Experts was not a separate supplier from Lincare, and was, instead, doing business as a subpart of Lincare in Missouri.

### (II)(C)(3)(d) *The Telephone Contacts Do Not Support FCA Liability*

It is undisputed that Lincare sold an item of DMEPOS to the exemplar beneficiaries within the fifteen months leading up to the phone calls in question. (DE 75 ¶ 20; DE 100 at 6). This situation fits the exception contained in the unsolicited telephone contact statute. Title 42 U.S.C. § 1395m(a)(17)(A)(iii) expressly provides that a supplier may make telephone contact with a beneficiary "regarding the furnishing of a covered item other than a covered item already furnished to the individual, [if] the supplier has furnished at least 1 covered item to the individual during the 15–month period preceding the

---

**31.** The Court emphasizes that the only companies it is concerned with in this case are the named Defendants: Lincare Holdings, Inc.

and Lincare, Inc. d/b/a Diabetic Experts of America.

date on which the supplier makes such contact." Because Diabetic Experts is the same DMEPOS supplier as Lincare, the provision of oxygen supplies to the beneficiaries within the fifteen months preceding the calls satisfies the exception to 42 U.S.C. § 1395m(a)(17)(A)(iii) and the six exemplars do not represent a violation of that rule. And because Diabetic Experts is not a separate supplier, Holdings did not violate 31 U.S.C. § 3729(a)(1)(B) by providing sales leads generated from Holdings' database of Lincare patient information.

■ Nevertheless, Relators direct the Court to guidance from CMS that they argue clearly supports their view on the telephone contact issue. The guidance they rely upon is inapposite for three reasons. First, CMS published the guidance in response to frequently asked questions concerning the revised standards for DMEPOS suppliers. (DE 100–7 at 17–19). This FAQ went into effect on September 27, 2010.[32] (DE 100–7 at 17–19). The foregoing discussion in sections (II)(C)(3)(b––c) *supra* regarding determination of suppliers makes clear that the interpretation advanced by Relators based on the 2010 FAQ would represent a substantive change in guidance. Accordingly, the date of promulgation makes the guidance inapplicable to these exemplars because substantive changes in CMS guidelines are not applied retroactively. *See* 42 U.S.C. § 1395hh(e). Second, CMS withdrew this guidance on June 4, 2012 without explanation. (DE 105 at 6; Feb.2014 email between DME MAC and NSC regarding CMS' direction to remove the FAQ on June 4, 2012 DE 105–1 at 3). The

Court defers to agency interpretations in part because they reflect accumulated expertise and considered judgments grounded in policy concerns. *Brand X Internet Servs.*, 545 U.S. at 1002–03, 125 S.Ct. 2688. Guidance that is withdrawn without explanation has no power to persuade because it no longer possesses any of the factors that lent it weight. *See Arriaga*, 305 F.3d at 1238 (*Skidmore* deference depends on the thoroughness evident in the agency's consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and "all those factors which give it power to persuade."). Third, the guidance applied to "an affiliated entity[[33]]" (such as another enrolled LLC under the same parent corporation)." (SAC DE 43 ¶ 90). Diabetic Experts is not an affiliated or related entity, it is a subpart of Lincare. Accordingly, the post-hoc, withdrawn guidance relied upon by Relators is neither binding nor persuasive.

### (II)(C)(3)(e) *Diabetic Experts' AOB Use Does Not Support FCA Liability*

The AOBs used by Diabetic Experts were originally given to Lincare. (DE 75 ¶¶ 33–37). Maintaining those signed statements on file allowed Lincare to submit claims for payment to the government. The AOBs were effective indefinitely and there is no evidence that the exemplar beneficiaries withdrew their consent before Medicare was billed by Diabetic Experts for the DMEPOS provided. *See* 42 C.F.R. § 424.40(d). For the reasons discussed above, Lincare and Diabetic Experts are one supplier for the purposes of Medicare

---

**32.** Defendants assert that the guidance was not in fact issued by the DME MAC until January 14, 2011. (DE 100–7 at 13). The difference is of no moment because the last exemplar transaction took place before either date.

**33.** An affiliate is a person or organization that is related to another person or organization through a compensation arrangement or ownership. 42 C.F.R. § 424.57(a).

billing and thus, a new AOB in the name of Diabetic Experts was not required.

It should be noted that the AOBs signed by the exemplar beneficiaries were not identical. (*See* DE 75-2 at 73, 78, 83, 88, 93, and 98). Some of the AOBs refer to Lincare and others refer to "supplier and its affiliates." (*Id.* at 78, 88). Nevertheless, all six of the exemplar beneficiaries' AOBs contain clear language providing for services to be rendered by "Lincare" or "Supplier." (DE 75 ¶¶ 33–34; DE 101 ¶¶ 33–34 ("Undisputed as to the content of the forms executed by the six beneficiaries")). Inasmuch as Lincare and Diabetic Experts are the same supplier, there was adequate notice of this use of the Lincare AOBs by Diabetic Experts and there was no per se violation simply because the name Diabetic Experts did not appear on them. *See* 42 C.F.R. § 424.36(a) (providing that a supplier may maintain the customer's signature on file using a form "that contains adequate notice to the beneficiary ... that the purpose of the signature is to authorize a provider or supplier to submit a claim to Medicare."). In addition, Holdings did not make or use a false record by allowing Diabetic Experts to access or use the AOBs.

### (II)(C)(4) *Regulations Do Not Require New Assignments For These Supplies*

Relators argue that even if Diabetic Experts were permitted to use the Lincare AOBs, those AOBs could not be used for the exemplar beneficiaries' diabetic testing supplies. Although an AOB may be effective and maintained on file indefinitely, a new AOB is required for a new piece of "equipment." 42 C.F.R. § 424.40(d)(2) (providing that "a new statement is required if another item of equipment is rented or purchased."). Relators argue that Defendants' construction of the new AOB requirement is impermissibly narrow and, in the alternative, that the testing strips, lancets, disposable lancet devices, and testing solution provided to the exemplar beneficiaries were new equipment that would require a new AOB. Defendants rejoin that the diabetes testing supplies were not new pieces of equipment, because they were not "equipment" at all.

The dispute between Relators and Defendants concerning the supplies and equipment distinction is best understood through a *Chevron* framework. In the two-step *Chevron* analysis, a court first determines whether Congress has spoken to the precise question at issue. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. As the Eleventh Circuit recently explained "[i]f Congress' intent is clear, we, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Alas–Murcia v. U.S. Atty. Gen.,* 589 Fed. Appx. 441, 442 (11th Cir.2014) (internal quotation and citation omitted). Relators argue that the "express statutory definition of DME provided by Congress" is found in 42 U.S.C. § 1395x and no further analysis is warranted. (DE 100 at 18). The Court does not agree. *See United States v. Baxter Intern., Inc.,* 345 F.3d 866, 886 (11th Cir.2003) (ambiguity may be found where a statute has more than one plausible interpretation).

"[A]lthough the statute includes a nonexclusive statutory list of representative medical equipment," it does not specifically define the term DME. *Currier v. Leavitt,* 490 F.Supp.2d 1, 3 (D.Me.2007) (citation and internal quotation omitted); 42 U.S.C. § 1395x(n) (listing "iron lungs, oxygen tents, hospital beds, and wheelchairs" along with "blood-testing strips and blood glucose monitors"). This nonexclusive list is included within the broad category of DME. *See Currier,* 490 F.Supp.2d at 3. Title 42 U.S.C. § 1395x(n) does not directly address how to determine whether a covered item of DME is considered a piece

of equipment or a supply for assignment and billing purposes. DME includes both "durable medical equipment" and "supplies used in conjunction with durable medical equipment," but the applicable statutes do not define how one category is distinguished from the other. *See* 42 U.S.C. § 1395w–3(a)(2)(A); 42 U.S.C. § 1395m(a)(1)(H). Consequently, Congress' intent on this precise question is unclear, and the Court must consider the agency's interpretation as expressed through the regulations.

■ If "Congress has not directly addressed the matter or the statute is ambiguous with respect to the matter, [courts] move to *Chevron's* second step." *Alas–Murcia,* 589 Fed.Appx. at 442–43. In the second step, courts "do not simply impose [their] own construction of the statute, but instead ask whether the agency's answer is based on a permissible construction of the statute." *Fla. Med. Ctr. of Clearwater, Inc. v. Sebelius,* 614 F.3d 1276, 1281 (11th Cir.2010). Here, there is no suggestion or argument that the regulations were arbitrarily created by the Secretary or CMS or that they are an impermissible construction of the statute. Accordingly, the Court gives them controlling weight. *See Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778.

When construing a regulation, the Court looks to the "regulation's plain language." *Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. 2381. Relators argument that diabetic testing strips are equipment by virtue of being listed in 42 U.S.C. § 1395x's description of DME is unavailing because "[t]he regulatory definition of DME focuses not on examples, but rather on qualitative criteria." *Warder v. Shalala,* 149 F.3d 73, 76 (1st Cir.1998). The regulations clarify the statute by explaining that supplies are those nondurable items "necessary for the effective use" of *durable* medical equipment. 42 C.F.R.

§ 414.402(2). "Durable medical equipment means equipment, furnished by a supplier" that "can withstand repeated use." 42 C.F.R. § 414.202(1). A recent proposed rule in the related area of Medicaid benefits, confirms this interpretation of the Medicare distinction between supplies and equipment:

> We are now taking this opportunity to propose criteria defining home health supplies, equipment, and appliances, **to better align with the Medicare program's definition of durable medical equipment found at** § 414.202. We propose that supplies are defined as "health care related items that are consumable or disposable, **or cannot withstand repeated use by more than one individual.**" We propose that medical equipment and appliances are "items that are primarily and customarily used to serve a medical purpose, generally not useful to an individual in the absence of an illness or injury, **can withstand repeated use, and can be reusable or removable.**"

Medicaid Program; Face–to–Face Requirements for Home Health Services; Policy Changes and Clarifications Related to Home Health, 76 Fed.Reg. 41032–01, 41034 (July 12, 2011) (proposed rule clarifying 42 C.F.R. Part 440) (emphasis added); *Wis. Dept. of Health & Family Servs. v. Blumer,* 534 U.S. at 497, 122 S.Ct. 962 (a proposed rule expressing agency position "warrants respectful consideration.").

It is beyond peradventure that the testing strips, lancets, disposable lancet devices, and testing solution cannot withstand repeated use. Therefore, they are not pieces of equipment. Rather, they are the supplies necessary for the effective use of a blood glucose home testing monitor. As a result, the AOBs used in the six exemplar transactions continued to be effective because Defendants did not send

new "equipment" that would have required a new AOB.

### (II)(C)(5) *The Six Exemplars Do Not Demonstrate Scienter*

■ Scienter is a necessary element of a claim under both 31 U.S.C. § 3729(a)(1)(A) and (B). *See also Urquilla–Diaz*, 780 F.3d at 1045. A court may enter summary judgment in favor of a defendant when there is no evidence in the record to support a relator's allegation that the defendant knew or should have known that its policies or practices violated the applicable statutes and implementing regulations. *Id.*

The Eleventh Circuit recently discussed the False Claims Act's "nuanced" scienter requirement in considerable depth and detail. The decision in *Urquilla–Diaz* cogently explains why the Court cannot find Defendants liable for the claims submitted and records made in connection with the six exemplars:

■ For liability to attach, the relator must show that the defendant acted "knowingly," which the Act defines as either "actual knowledge," "deliberate ignorance," or "reckless disregard." § 3729(b). Although proof of a "specific intent to defraud" is not required, *id.* the statute's language makes plain that liability does not attach to innocent mistakes or simple negligence, [*United States v. King–Vassel*, 728 F.3d 707, 712 (7th Cir.2013) ].

Congress added the "reckless disregard" provision to the False Claims Act in 1986. *United States ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 530 (6th Cir.2012). The Senate Report accompanying this change states that this language was added to ensure that "knowingly" captured "the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted."

S. Rep. 99–345, at 21; *reprinted in* 1986 U.S.C.C.A.N. 5266, 5286. Liability attaches to "[o]nly those who act in gross negligence"—those who fail "to make such inquiry as would be reasonable and prudent to conduct under the circumstances." *Id.* at 20 (quotation marks omitted). In other words, Congress did not intend to turn the False Claims Act, a law designed to punish and deter fraud, *see Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1237 n. 1 (11th Cir.1999), "into a vehicle either 'punish[ing] honest mistakes or incorrect claims submitted through mere negligence' or imposing 'a burdensome obligation' on government contractors...." *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C.Cir.2010) (quoting S. Rep. 99–345, at 6, 19).

*Urquilla–Diaz*, 780 F.3d at 1058.

The Eleventh Circuit further observed that deliberate ignorance requires "even more culpability" than that needed to constitute reckless disregard. *Urquilla–Diaz*, 780 F.3d at 1058 n. 15. Accordingly, a court that finds a defendant did not recklessly disregard its obligations and duties also must conclude that the defendant was not deliberately ignorant of violations to the relevant regulations.

Relators' best evidence regarding Diabetic Experts' knowledge that their course of conduct might result in false claims concerns only the AOBs and not compliance with the unsolicited telephone contact proscription. Relators point to a March 2009 email where an employee expressed concern that Diabetic Experts had received AOBs from other "Lincare centers" that do not "meet guidelines." (DE 102–5 at 2). But this exchange focused on deficiencies in the AOBs having nothing to do with Diabetic Experts practice of using "AOBs from other Lincare centers in order to ship/bill the diabetic supplies."

(*Id.*). The defect in the AOBs addressed in the March 2009 email was that they were not properly signed by the beneficiary; this is unrelated to the issues presented by the six exemplars and pleaded in the SAC. (*Id.*).

Relators also make much of an October 2009 email between Defendants' employees regarding whether new AOBs were required for new pieces of diabetic testing "equipment." (DE 114 at 4–5). In that October 2009 email, Lincare personnel discussed the issue of AOBs, recognizing that they "[m]ay need to reconsider [their] process for Patient Agreements." (DE 114 at 4). Here, the last exemplar transaction at issue was initiated in May 2009. Relators do not explain how an October email would allow a reasonable jury to conclude that Diabetic Experts knowingly submitted false claims in May of the same year based on existing AOBs. *Urquilla–Diaz*, 780 F.3d at 1062 (finding that district court did not err in concluding that October 2005 notice from agency regarding lack of compliance was not sufficient to create a jury question regarding 2004 false certification of compliance).

Contrary to Relators' assertions that Defendants disregarded AOB regulations, the March and October 2009 email conversations indicate that Defendants were monitoring their AOBs with an eye toward compliance and culling out invalid AOBs. (DE 102–5 at 2). Even if in hindsight, the claims were proved to be objectively false, the record demonstrates that Defendants could have had a reasonable, non-reckless belief that: 1) Diabetic Experts could contact Lincare customers; 2) Diabetic Experts could submit claims to Medicare based on AOBs given to Lincare; 3) Diabetic Experts could submit claims for testing strips, lancets, disposable lancet devices, and testing solution based on broadly written AOBs for the provision of "HME and supplies" or "DME"; 4) Diabetic Experts could access the same information from Holdings as could Lincare; and 5) Holdings could provide the patient information and AOBs to Diabetic Experts. *See United States ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1191 (8th Cir.2010) (To prevail under the False Claims Act, "relators must show that there is no reasonable interpretation of the law that would make the allegedly false statement true.").

■ Summary judgment in favor of a False Claims Act defendant is appropriate where the relator has "not raised a genuine issue of material fact regarding scienter." *Urquilla–Diaz*, 780 F.3d at 1049, 1059. It is not enough to allege that Defendant might have known that its telephone marketing and use of AOBs may have been stretching the limits of best practices for Medicare suppliers. Relators must point to facts that show that Defendants knew or should have known that those practices rendered the claims they submitted false. *See United States ex rel. Modglin v. DJO Global Inc.*, 48 F.Supp.3d 1362, 1405 (C.D.Cal.2014) ("While relators do plead facts supporting an inference that defendants knew they were supplying stimulators to patients for off-label use, none of their allegations supports an inference that they knew they could not lawfully seek reimbursement for the stimulators from Medicare."). Furthermore, "Courts have found that even if a defendant submits a false claim, if the defendant's interpretation of a statute or regulation was reasonable, and if there is no authoritative contrary interpretation of the rule, the relator cannot satisfy the knowledge requirement under the False Claims Act." *United States ex rel. Parker v. Space Coast Med. Assocs., L.L.P.*, 94 F.Supp.3d 1250, 1262, Case No. 6:13–CV–1068–ORL–22, 2015 WL 1456122, at *8 (M.D.Fla. Feb. 6, 2015) (collecting cases) (internal quotation

omitted). Without making a finding regarding ambiguity in the regulation, the Court notes that a defendant's "reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud under the FCA." *United States ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 831–32 (8th Cir.2013).

Simply put, to survive summary judgment on the exemplars, Relators must cite record evidence "from which a reasonable jury could conclude that [defendant] knowingly and falsely certified its compliance" or knowingly made or used a false record. *Boeing*, 2014 WL 5025782, at *21. They have not done so. Therefore, the Court finds as a matter of law that, with regard to the six exemplars, no reasonable jury could find for Relators on the questions of whether Defendants submitted false claims or made or used false records with the requisite scienter.

### (II)(C)(6) *The Six Exemplars Do Not Demonstrate Falsity*

 There is a line of authority suggesting that disputes as to the interpretation of regulations do not implicate False Claims Act liability. *See, e.g., Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478 (9th Cir.1996) ("[T]o take advantage of a disputed legal question, as may have happened here, is to be neither deliberately ignorant nor recklessly disregardful."); *United States ex rel. Swafford v. Borgess Med. Ctr.*, 24 Fed.Appx. 491, 491 (6th Cir.2001) (same). As a practical matter, the falsity analysis is intertwined with the scienter analysis. *See United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir.1999) ("[I]t is impossible to meaningfully discuss falsity without implicating the knowledge requirement."); *United States ex rel. Morton v. A Plus Benefits, Inc.*, 139 Fed.Appx. 980, 982 (10th Cir.2005) ("[F]alsity and scienter requirements are inseparable.");

*Modglin*, 48 F.Supp.3d at 1405 ("The deficiencies the court has noted in relators' pleading of falsity also render inadequate their allegations of scienter."). A claim is not false under the False Claims Act if the defendant is acting based on a reasonable interpretation of the regulations. *See Lamers*, 168 F.3d at 1018 (reasoning that "faulty calculations," "flawed reasoning," "imprecise statements," or "differences in interpretation growing out of a disputed legal question" are not "false" under the False Claims Act). A claim that turns on a "disputed legal question" rather than an objective falsehood is not false. *Wilson*, 525 F.3d at 377. "Expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false." *Morton*, 139 Fed.Appx. at 983.

 The gravamen of a False Claims Act claim is the submission of a *false* claim. *Urquilla–Diaz*, 780 F.3d at 1052 ("[O]ur caselaw is clear."); *Morton*, 139 Fed.Appx. at 982 ("A false or fraudulent claim is a common requirement."). Merely alleging a colorable claim that a statute or regulation relevant to Medicare has been violated is not sufficient. It is the submission and payment of a false Medicare claim, use of records known to be false, and false certification of compliance with the laws that create False Claims Act liability. *See Mastej*, 591 Fed. Appx. at 706; *Hendow*, 461 F.3d at 1172 (holding that for a defendant to be "found liable under the False Claims Act," he must make "a palpably false statement, known to be a lie when it is made."). A reasonable, but erroneous interpretation of a complex statutory or regulatory scheme should not, without facts demonstrating reckless disregard, create False Claims Act liability. The record does not support the conclusion that Defendants failed to comply with the supplier standards and regulations concerning telephone contact and the use of AOBs. Diabetic Experts did

not violate the False Claims Act by submitting claims arising out of the telephone contacts or using the AOBs on file. And Holdings did not violate the False Claims Act by allowing Diabetic Experts to access and use information that was available to Lincare. Therefore, for the reasons set forth above, Defendants are not liable[34] under the False Claims Act for the alleged violations exemplified by the six beneficiary transactions identified in the SAC and Defendants' motion for partial summary judgment is **GRANTED.**

### (II)(D) *Remaining Claims*

The Parties have indicated that the Court's resolution of the motion for summary judgment regarding Relators' six exemplars is not case dispositive. The discovery disputes presided over by Magistrate Judge Simonton and the briefing related to this motion for partial summary judgment demonstrate that Relators believe claims might lie regarding Med4Home, Inc., Reliant Pharmacy Services, or other entities related to Defendants. Accordingly, the Parties shall submit a joint status report to the Court regarding what issues, if any, remain. However, it should be noted that the SAC is the operative pleading. Under this Circuit's stringent False Claims Act pleading standard, entities not named in the SAC and any alleged claims against them are not a part of this case. *Keeler*, 568 Fed. Appx. at 805 (quoting *Clausen*, 290 F.3d at 1313).

---

**34.** This does not mean, however, that there is no risk to Defendants for the purported violations. The Secretary of Health and Human Services could always initiate proceedings to strip Lincare of its eligibility to participate in Medicare if the Secretary thought Lincare's interpretation of the Medicare statutes and regulations warranted sanction. *See* 42 U.S.C. § 1395m(a)(17)(C); 42 C.F.R. § 424.57(e); *Hobbs*, 711 F.3d at 717 (noting that "compliance may of course be enforced administratively through suspension, disquali-

(III) *CONCLUSION*

For the reasons discussed above, it is **ORDERED AND ADJUDGED** as follows:

1. The motion for partial summary judgment (DE 74) is **GRANTED.**

2. The motion to strike expert report (DE 104) from Relators' filings is **GRANTED IN PART.**

3. By 5:00 p.m. on July 22, 2015, the Parties shall file a joint status report indicating what claims, if any, remain and how they propose to proceed.

**DONE and ORDERED**

fication, or other remedy."); *see also* Additional (DMEPOS) Supplier Enrollment Safeguards, 75 Fed.Reg. at 52631 ("We believe that if CMS or the NSC through on-site inspection obtains or develops evidence that a DMEPOS supplier has made prohibited contacts with Medicare beneficiaries in violation of the provisions found in this section that CMS or the NSC may revoke that supplier's billing privileges, and may determine if such billing may be for fraudulent or unnecessary supplies.").